**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**AC, a minor, by and through RC,**
       **As parent and next friend,**

              **Plaintiff,**

**v.**                                                    **Case No.: 3:22-cv-00336-HEH**

**HENRICO COUNTY SCHOOL BOARD**

              **Defendant.**

<u>**SUMMARY OF THE ADMINISTRATIVE RECORD**</u>

The parties, jointly, pursuant to the Court's orders of December 1, 2022 and January 13, 2023, provide the Court with the following Summary of the Administrative Record.

**Introduction**

The Administrative Hearing in this matter began on June 14, 2021.  It was a virtual hearing conducted over eight days ending July 14, 2021.  The presiding hearing officer, William S. Francis, Jr., Esq., stated at the outset that exhibits would be marked but not admitted until "they are referred to and they pass all the admissibility tests."  Hearing Transcript 5:17-25.

**Student's Case**

**I.     Rebecca Crowe, AC's Mother**

The plaintiff called three witnesses in her case-in-chief.  The first was AC's mother, Rebecca Crowe, who testified on June 14-15, 2021.  Hr'g Tr. 35:19-20.  Ms. Crowe testified as a lay person, not an expert.  She admitted she was not a reading specialist or a psychologist.  Hr'g Tr. 162:21-163:12.  She is not a licensed teacher and has no degree in education.  Hr'g Tr. 191:21-25.  She is not certified in any reading programs.  Hr'g Tr. 192:1-6.

Ms. Crowe testified that AC was enrolled in second-grade at Grove Christian School in early 2019 when one of her teachers suggested that she be tested because she was struggling to read.  Hr'g Tr. 53:6-15.  Ms. Crowe indicated that she reached out to Henrico County Public Schools (HCPS) personnel at Pinchbeck Elementary School and shared that AC was "struggling to read and do math."  Hr'g Tr. 53:16-24.  After an in-person consultation, AC enrolled at Pinchbeck on January 29, 2019.  Hr'g Tr. 54:25.  Upon entry into Pinchbeck Elementary School, AC scored 16% on reading and 36% on math on benchmark tests.  Hr'g Tr. 55:1-5.  According to Ms. Crowe, AC could not read on grade-level, and her reading difficulties caused social difficulties at Grove Christian.  Hr'g Tr. 55:11-56:9.

Ms. Crowe testified that an eligibility meeting occurred on March 28, 2019.  Hr'g Tr. 56:16-57:5.  Subsequently, AC's parents agreed to a Section 504 Plan for AC.  Hr'g Tr. 58:25-59:8.  Ms. Crowe testified that the Section 504 Plan did not include reading instruction.  Hr'g Tr. 61:5-10.  AC's parents delayed signing and implementing the Plan, according to Ms. Crowe's testimony, because of an issue with AC's transportation to and from school.  Hr'g Tr. 62:9-19.

Ms. Crowe testified that AC's grades were poor after the implementation of the Section 504 Plan, and that AC had "HATS" test results of 31 percent in reading and 52 percent in math.  Hr'g Tr. 63:11-64:2.  Another eligibility meeting occurred in June 2019.  Hr'g Tr. 64:8-10.  The School Board found AC at that time eligible for an Individualized Education Program (IEP) under the Other Health Impairment category because of her ADHD, but, according to Ms. Crowe, did not discuss whether AC had a reading disability.  Hr'g Tr. 65:5-10.  Ms. Crowe testified that she was able to provide her concerns in writing to the HCPS IEP team (for a meeting held on June 25, 2019) even though she was unable to attend the initial IEP meeting in person, and that the initial IEP included all of those concerns verbatim.  Hr'g Tr. 148:17-149:12.

AC's parents attended another IEP meeting on August 29, 2019 at which they first broached the possibility that AC had dyslexia because "this [was] the first time that we ourselves were even knowledgeable of it."  Hr'g Tr. 67:21-23.  This suggestion followed from testing with Westhampton Family Psychologists that Sarah Modrak, the principal of Pinchbeck Elementary, recommended.  Hr'g Tr. 49:16-50:17.  An individual there recommended that AC receive testing for dyslexia from Riverside School.  Hr'g Tr. 50:1-13.  Ms. Crowe testified that this testing showed AC had "all the markers for dyslexia," but that Modrak, at the August 2019 meeting, rejected that assertion.  Hr'g Tr. 43:13-22.  Ms. Crowe's primary goal at this meeting was to secure reading services, which, she claimed, the School Board refused to provide.  Hr'g Tr. 68:15-25.  Ms. Crowe testified that the Crowes retained a private, Orton-Gillingham reading tutor for AC.  Hr'g Tr. 69:5-70:12.  Two 50-minute sessions with the tutor cost $60 per week, but it is unclear how many sessions were provided.  Hr'g Tr. 79:10-19.

In October 2019, Westhampton Family Psychologists tested AC and determined that she had ADHD and dyslexia.  Hr'g Tr. 86:11-17; see also Parent (P.) Ex. 1009 (AR002463).  Around the same time, HCPS tested the student and determined that she had an auditory processing disorder.  Hr'g Tr. 86:18-24.  According to Ms. Crowe, this condition makes it difficult for "any information that goes into the left ear for her to process it."  *Id.*

On October 18, 2019, Ms. Crowe observed AC receiving instruction at school.  Hr'g Tr. 88:4-89:10.  On that occasion, according to Ms. Crowe, AC demonstrated that she did not know how to write the alphabet past the letter N.  Hr'g Tr. 89:15-17.  Based on what she saw, Ms. Crowe concluded that Jessica Alfasi, AC's teacher at the time, was using guided reading, not structured literacy, which is required for children with dyslexia because "it's multi-sensory, it's direct, and it's provided in fidelity."  Hr'g Tr. 89:19-90:13.

At a meeting on November 26, 2019, Ms. Crowe testified, she unsuccessfully sought information about which structured literacy program HCPS would use with AC.  Hr'g Tr. 90:18-91:12.  The head of HCPS's hard of hearing and visually impaired program was present, but there was no audiologist or dyslexia specialist.  Hr'g Tr. 92:12-20.  The team found that AC had dyslexia, a special learning disability, and ADHD, under Other Health Impairment.  Hr'g Tr. 92:22-25.  Ms. Crowe claimed that this conclusion about dyslexia came eight months after she had initially raised the issue with HCPS despite her earlier testimony that she first brought this issue to the attention of HCPS in late August, three months earlier.  Hr'g Tr. 92:22-93:6; 67:18-23.

HCPS representatives and parents met on December 19, 2019 for another IEP meeting which resulted in the same services being provided to AC despite her new dyslexia diagnosis because, according to Sarah Modrak, the principal at Pinchbeck, the services from the August IEP were appropriate for a student with dyslexia.  Hr'g Tr. 94:12-95:4.  HCPS also denied accommodations sought by Ms. Crowe because HCPS wanted to do a 30-day trial to collect data that Rebecca Hodell, the dyslexia advisor, could review.  Hr'g Tr. 93:8-94:11.  Ms. Crowe testified that the IEP team did not include a dyslexia specialist and that she was not aware whether there was a reading specialist present or what the credentials of the chair of the audiology department were.  Hr'g Tr. 95:1-15.

In March 2020, the COVID pandemic caused the closure of HCPS schools.  Hr'g Tr. 95:17-20.  According to Ms. Crowe, HCPS did not provide special education services in accordance with the existing IEP during that time.  Hr'g Tr. 96:9-21.  According to Ms. Crowe, she requested "extended school year" for AC so that she would receive "reading instruction," but HCPS said AC "was making progress" and "did not need any reading instruction."  Hr'g Tr.

4

98:6-12.  She also testified that no one from HCPS ever addressed the possibility of AC regressing.  Hr'g Tr. 98:21-24.

Ms. Crowe testified that, in July 2020, testing performed by Children's Hospital indicated that AC "had made no progress since previous evaluations in September of 2019."  Hr'g Tr. 99:22-100:1.  According to her, this testing showed that AC was on a kindergarten level with regard to phonemic awareness even though she was going into the fourth-grade.  Hr'g Tr. 105:9-106:4.  HCPS personnel examined this information in October 2020 during an IEP meeting.  Hr'g Tr. 100:18-23.  Ms. Crowe felt it was urgent "to do something" because AC was falling behind her peers, but HCPS provided data from February 2020 to show that AC was making progress.  Hr'g Tr. 101:2-102:18.

At the October 6, 2020 IEP meeting, according to Ms. Crowe, she stressed the need for "Structured Literacy" as opposed to guided reading.  Hr'g Tr. 113:7-21.  On November 1, HCPS teacher Terri Crenshaw started providing reading instruction in AC's "resource class," which, according to Ms. Crowe, meant AC would not have art, music, PE or any other resource classes for the rest of the year.  Hr'g Tr. 115:11-116:6.

On or about December 1, 2020, testing from Children's Hospital showed that AC was now on a second-grade level for phonemic awareness.  Hr'g Tr. 118:24-119:5.  Ms. Crowe made HCPS aware of this test result.  Hr'g Tr. 119:21-120:5.

At an IEP meeting on December 17, 2020, HCPS representatives maintained that AC had met all of her goals based on data that Ms. Crowe felt was outdated.  Hr'g Tr. 120:6-121:23.  Ms. Crowe testified that AC's grades were inflated because HCPS weighed all grades, including participation, equally.  Hr'g Tr. 124:12-125:1.  According to Ms. Crowe's testimony, AC's

scores for participation were inconsistent with Ms. Crowe's observations that AC could not complete assignments and, according to her teachers, "was not participating." Hr'g Tr. 125:2-20.

A follow-up IEP meeting occurred on January 14, 2021. Hr'g Tr. 125:22-25. HCPS refused to make unspecified changes to the IEP that Ms. Crowe requested based on insight from an advocate of hers. Hr'g Tr. 127:10-128:5.

A third IEP meeting occurred on January 22, 2021. Hr'g Tr. 128:10-11. Ms. Crowe asserted that AC was getting no educational benefit from her enrollment at HCPS. Hr'g Tr. 128:10-21. According to Ms. Crowe, HCPS personnel had predetermined that AC did not need a private school setting and did not provide any education to Ms. Crowe about different options that were available. Hr'g Tr. 129:9-130:5. Ms. Crowe testified that Rebecca Hodell performed a Qualitative Reading Inventory (QRI) that showed AC was instructional on the fourth-grade level, but claimed Hodell scored the test incorrectly; AC was actually on a third-grade instructional level, according to Ms. Crowe. Hr'g Tr. 131:3-23. Ms. Crowe claimed that she convinced HCPS to disregard Hodell's incorrect conclusions. Hr'g Tr. 132:5-10. This experience was disheartening to Ms. Crowe, who questioned the competency of HCPS staff, particularly Virginia Ramos, who has a provisional license. Hr'g Tr. 133:13-135:20.

Ms. Crowe did not discuss The New Community School on direct examination. On cross-examination, she testified that that New Community had accepted AC for the 2021-22 school year, and that AC would not return to Henrico County Public Schools. Hr'g Tr. 180:24-181:4; 181:9-12; 183:15-18; 185:18-20. While Ms. Crowe testified that she had requested that AC "be placed in a school that specializes in language disabilities," Hr'g Tr. 183:11-13, she did not testify that she gave any notice to HCPS that AC would be attending New Community. Indeed, she specifically admitted that she did not tell HCPS that she had even applied for AC to

6

attend New Community.  Hr'g Tr. 247:15-248:1.  Further, she did not testify about any costs associated with New Community or provide any testimony about why New Community was the least restrictive environment for AC or why a private placement for AC at New Community was necessary for AC to receive a Free Appropriate Public Education (FAPE).

## II.     Jenna Hynes, Expert

The plaintiff's next witness was Jenna Hynes, who testified on June 15, 2021.  The Hearing Officer allowed Hynes to testify as an expert despite an objection from the School Board that no evidence suggested that Hynes had any educational background or other actual expertise in dyslexia.  Hr'g Tr. 259:12-260:9.  Hynes is "a parent and a volunteer," not a licensed teacher, school psychologist, medical doctor or other professional.  Hr'g Tr. 295:5-15.  She is not trained in the relevant reading programs and never observed AC receiving instruction.  Hr'g Tr. 303:1-2; 307:2-10.

Hynes testified that when she participated in IEP meetings for AC, she had to educate the staff regarding interventions for AC.  Hr'g Tr. 281:25-282:5.  She opined that "although [AC] may have trouble learning to read, she is capable of understanding all the grade level material." Hr'g Tr. 282:6-10.  Hynes testified that dyslexic "[s]tudents need text to speech assistive technology, computerized technology" to access their curriculum and interact with content.  Hr'g Tr. 283:3-8.  Hynes testified that "up to the point where [she] got involved," HCPS had not provided assistive technology interventions.  Hr'g Tr. 283:9-15.  She further testified that AC needed a classroom of 12 or less, while knowing that the county classes are 20-25.  Hr'g Tr. 286:5-20.

When asked whether any HCPS personnel knew anything about New Community or other private dyslexia programs, Hynes testified, "They did not offer it if they had any

knowledge." Hr'g Tr. 288:2-7.  Hynes testified that, based on what she's been told, experienced, and heard, "maybe" HCPS had the staff to provide FAPE to AC.  Hr'g Tr. 288:8-289:5.  She testified that she supported the efforts of AC's parents to place AC in a private dyslexia program. Hr'g Tr. 290:5-10.  Hynes testified that a proposal whereby AC attends an HCPS school, but receives private tutoring, "is something to consider," but might be too fatiguing for AC.  Hr'g Tr. 291:13-293:4.

### III.   Debra Tisler, Expert

The plaintiff's last witness in her case-in-chief was Debra Tisler, whom the Hearing Officer accepted as an expert over the objection of HCPS that AC's representative failed to provide a resume of her qualifications prior to the hearing and that she had no recent experience working as a teacher.  Hr'g Tr. 316:8-25; 323:24-324:10.  Tisler earned a bachelor's degree in special education in 1997 and has "been a special education teacher . . . since then."  Hr'g Tr. 315:2-8.  She later admitted that she had not taught in a classroom since 2014 and was not licensed to teach in the Commonwealth of Virginia.  Hr'g Tr. 322:6-9; 323:13-20; see also Hr'g Tr. 375:24-376:2.  Tisler testified that she used her educational training to do file reviews, observe children, and "to support families."  Hr'g Tr. 322:10-24.  She acknowledged, however, that in the two years prior to the hearing she had never attended a meeting for AC nor did she ever observe AC during instruction provided by either HCPS or any other school. Hr'g Tr. 375:7-17.

Tisler testified that she had reviewed some of AC's educational records and could not find documentary evidence that RTI or MTSS interventions had been put in place for her.  Hr'g Tr. 324:15-24.  The record does not reflect that Tisler ever defined what "RTI" was, but she described MTSS as tiered programming "implemented for either a child or children."  Hr'g Tr.

319:11-21.  Tisler testified that a "running record" is used to "gauge whether or not the child is making progress."  Hr'g Tr. 325:17-23.  She criticized one running record from May 31, 2019, i.e., the end of AC's second-grade year, as being incomplete because the teacher did not note the student's self-corrections.  Hr'g Tr. 326:1-327:23. The record further showed that AC's fluency, i.e., her ability to read a certain number of words per minute, was low.  Hr'g Tr. 328:1-8.  Tisler criticized the teacher's unclear documentation.  Hr'g Tr. 330:3-7; 331:17-24.  Tisler concluded that the data from May 2019 is conflicting and "really not clear," but "there [was] something going on there, especially since it took so long for her to read that passage."  Hr'g Tr. 332:23-333:8.

Tisler next looked at documentation from a meeting held two months earlier, on March 28, 2019.  Hr'g Tr. 333:10-21 (discussing HCPS Ex. 6 (AR000369-AR000375)).  She faulted the documentation for lacking some data.  Hr'g Tr. 334:17-21.  The fact that a box was not checked on the form indicated to Tisler that the School Board had not "implement[ed] a scientific-based research-based intervention" for AC.  Hr'g Tr. 335:14-336:3.  Tisler believed AC required such intervention because she "re-enrolled with a D in reading."  Hr'g Tr. 337:5-8.  She further faulted the School Board for concluding that AC experienced no adverse effect on her educational performance even though she had a "weaknesses in attention and in hyperactivity." Hr'g Tr. 337:25-338:12.  Tisler concluded her discussion of the document by stating, "It's hard for me to understand how a student can have all of these pieces, all of these areas checked off and not have an adverse effect on their academic achievement."  Hr'g Tr. 341:8-11.

Later, Tisler testified about an Eligibility Summary from June 6, 2019.  Hr'g Tr. 349:16-20 (discussing HCPS Ex. 17 (AR000407-AR000411)).  Tisler stated that the summary shows that AC's reading grade remained unimproved and the summary lacks a discussion of the five

9

components of reading. Hr'g Tr. 350:18-23. She further faulted HCPS for not providing intervention for AC since the March 28 and May 31, 2019 reports. Hr'g Tr. 351:2-21. Tisler stated that the summary was deficient: "Specific documentation as far as the instructional strategies should be listed, as well as, if there was a program that was implemented, as well as, frequency and duration." Hr'g Tr. 353:21-24.

Tisler testified that she did not have any confidence in HCPS's determinations regarding AC. Hr'g Tr. 354:11-14. She stated that 150 minutes a week of reading instruction was not sufficient "to meet hard dual deficit dyslexia, which is disphonetic dyseidetic dyslexia;" instead AC should have had 300 minutes per week. Hr'g Tr. 354:19-355:3. Tisler also found the description of the reading instruction insufficient. Hr'g Tr. 355:12-356:7. Tisler faulted HCPS for not conducting "weekly data collection" for AC. Hr'g Tr. 356:20-23. Tisler saw no evidence in the record that AC's parents were sabotaging AC's education. Hr'g Tr. 358:2-4.

In addition to discussing documentation from the first half of 2019, Tisler discussed AC's "most current IEP document."[1] Hr'g Tr. 341:12-14. She faulted this document for not having various goals related to AC's attention deficits. Hr'g Tr. 341:15-343:13; 344:19-345:8. She faulted HCPS for not more comprehensively evaluating AC's auditory processing disorder. Hr'g Tr. 343:10-344:17. She further faulted this IEP for lack of specifics on math instruction and for removing AC from the general educational setting. Hr'g Tr. 361:10-23. She further faulted it for failing to reach a conclusion about Extended Year Services until April 2021. Hr'g Tr. 362:13-19. Lastly, Tisler criticized the IEP for vagueness regarding the indirect services to be provided to AC and the auditory processing equipment. Hr'g Tr. 364:2-23.

---

[1] Although unclear, the student's advocate appears to refer to a draft IEP with a "Date of Creation" of January 27, 2021. Hr'g Tr. 360:24-361:1 (referencing P. Ex. 815-845 (AR002270-AR002300)).

Tisler, in general, did not testify at all about events in AC's education that occurred between June 6, 2019 and "the most current IEP" from 2021.

Tisler concluded her direct examination by stating HCPS could not educate AC, in part, at least, because HCPS does not have structured literacy programs.  Hr'g Tr. 364:24-365:12. Critically, however, Tisler offered no testimony about what sort of school could educate AC. Specifically, she did not discuss The New Community School at all and did not testify about why it was an appropriate private placement for AC or how long AC would need to be placed there or in any other school in order to provide compensatory educational services to remedy any deficiency in the education provided by HCPS or FAPE.  Further, she did not testify about the cost of New Community or any other school or about whether any other expenses for AC's education were reasonable and subject to reimbursement by HCPS.

Cross-examination of Tisler focused on bias and lack of familiarity with AC's education. For instance, Tisler admitted that AC's representative in the due process hearing had also represented Tisler in her own personal claim against a Virginia local educational agency.  Hr'g Tr. 374:19-25.  Tisler stated that she had never testified on behalf of a local education agency in a due process matter.  Hr'g Tr. 375:1-6.

In addition to her failure to attend any meetings with HCPS officials about AC or observe any instruction of her, Tisler admitted she did not listen to recordings of IEP meetings but rather based her testimony solely on a review of the student's written education records.  Hr'g Tr. 412:1-413:18.  Tisler admitted that she had never used the electronic system for drafting IEPs in Virginia and therefore was not familiar with what information could be documented in the actual IEP.  Hr'g Tr. 376:11-15.  Tisler admitted that the information developed in May 2019 could not have been considered in March 2019 despite her earlier testimony.  Hr'g Tr. 391:14-394:2.

11

Tisler faulted HCPS for "acquiescing" to AC's parents and advocates when it accepted their recommendation about the number of reading minutes to be put in her IEP.  Hr'g Tr. 415:3-416:19.

**The School Board's Case**

**I.      Sarah Modrak, Principal (Pinchbeck Elementary School)**

The School Board called its first witness, Sarah E. Modrak, on June 16, 2021.  Modrak was the former principal at Pinchbeck Elementary School.  Hr'g Tr. 448:1-3.  She has bachelor's and master's degrees in education.  Hr'g Tr. 448:4-9; HCPS Ex. 76, at 1-4 (AR000891-AR000894).  She has a year of experience as a reading interventionist in addition to multiple years as a teacher and administrator.  She is licensed in elementary education, educational supervision and administration and English as a second language.  Based on these qualifications, she was qualified as an expert by the hearing officer.  Hr'g Tr. 456:18-24.

Modrak testified that HCPS staff convened a "Child Find" meeting on January 17, 2019 with AC, her parents, and AC's teacher from Grove Christian Academy, to determine whether the team suspected a disability requiring special education evaluations prior to AC's likely enrollment at Pinchbeck at a later date.  Hr'g Tr. 459:12-16; 460:14-16; 462:3-7; see also HCPS Exs. 1 (AR000340-AR000344), 2 (AR000345-AR000351).  AC was a student at Grove Christian School at that time.  Hr'g Tr. 462:8-11.  The primary concern at the January 17 Child Find meeting was AC's attention issues.  Hr'g Tr. 463:16-22.  Based on data and information shared at the Child Find Meeting from AC's teacher at Grove Christian Academy, Modrak concluded at the meeting that AC was not receiving adequate instruction at her current school in reading, math, or writing.  Hr'g Tr. 467:12-17.  Modrak testified that based on the information shared from AC's private school teacher, no reading foundation had been provided to AC in

12

kindergarten or first-grade. Hr'g Tr. 466:20-24.  However, Modrak shared that the Child Find team decided to propose AC be evaluated for special education services to which the parents consented. Hr'g Tr. 467:18-20; 468:1.

AC enrolled at Pinchbeck in February 2019, earlier than expected.  Hr'g Tr. 468:15-22; 469:20-25; see also HCPS Ex. 1 (AR000340-AR000344).  Pinchbeck conducted benchmark tests to determine AC's baseline, completed the special education eligibility process, including evaluations, and offered AC's parents a Section 504 Plan in April 2019.  Hr'g Tr. 470:7-10; 474:22-475:7; HCPS Ex. 11 (AR000392- AR000394).  AC's parents did not sign the Section 504 Plan until May.  Hr'g Tr. 475:8-25.  AC's mother complained about her alleged lack of progress without giving the 504 Plan a chance to work.  Hr'g Tr. 477:23-478:4; see also HCPS Ex. 8 (AR000381).

Modrak and the HCPS team met with AC's parents on May 9.  Hr'g Tr. 490:10-13; see also HCPS Ex. 10 (AR000386-AR000391).  PALS is a benchmark test that shows a student's reading level.  Hr'g Tr. 492:8-16.  A PALS result available on May 9 showed that AC had missed a benchmark by one point, which was not a concern in Modrak's opinion because AC had been enrolled at Pinchbeck for such a short amount of time.  Hr'g Tr. 491:22-492:11; see also HCPS Ex. 10 (AR000386-AR000391).  The test result showed that AC was reading on a third-grade level with 96 percent accuracy and correctly answered five out of six comprehension questions; only her spelling score was deficient.  Hr'g Tr. 493:4-24; HCPS Ex. 13 (AR000398). Although her fluency was less than ideal, AC could read an entire story and answer questions about it. Hr'g Tr. 494:2-495:11.  HCPS provided additional accommodations to AC after this meeting.  Hr'g Tr. 496:17-24.

HCPS conducted additional comprehensive educational evaluation of AC in June 2019 based on various available assessments.  Hr'g Tr. 497:11-22; HCPS Ex. 15 (AR000400). Modrak was not concerned about AC's reading level because two tests showed that AC was reading on grade level and that she had shown growth since enrolling at Pinchbeck.  Hr'g Tr. 499:22-500:10; 503:20-24; HCPS Ex. 99 (AR001341-AR001352).  Indeed, AC's mother stated at that time that AC was reading on a third-grade level.  Hr'g Tr. 527:18-21; HCPS Ex. 20, at 4 (AR000421).

As a result of a meeting on June 6, 2019, the HCPS eligibility team determined that AC was eligible under the IDEA for Other Health Impairment as she required specially designed instruction to address her ADHD.  Hr'g Tr. 514:19-515:12; 519:2-19; HCPS Ex. 17 (AR000407-AR000411).  The team felt that AC's ADHD was impacting her in reading and math.  Hr'g Tr. 529:10-19.  The team considered the conclusions of a private evaluator, Dr. Steven Butnik, who felt that AC's ADHD was probably creating a gap between her abilities and her grades.  Hr'g Tr. 578:10-579:9; see also HCPS Ex. 12 (AR000395-397).  AC's D in Language Arts on her report card and her struggles with everyday assignments also contributed to the team's conclusion. Hr'g Tr. 528:3-7; 530:3-7; see also HCPS Ex. 21 (AR000422-AR000423).

The eligibility team sought to have a meeting with the parents to develop an IEP within 30 days as required by law, but the parents could not attend such a meeting.  Hr'g Tr. 520:8-522:12; 523:2-11.  The team was able to communicate with AC's parents to explain the situation prior to the meeting and confirm that the IEP would not take effect until the parents had meet with the HCPS team and provided consent.  Hr'g Tr. 522:9-12; 523:4-11; 526:14-22.  After Modrak reached out to AC's parents in July 2019 to set up a second IEP meeting, AC's parents met with HCPS representatives on August 29 and signed the IEP, consenting to its

14

implementation.  Hr'g Tr. 531:8-532:8; 535:14-17; HCPS Exs. 25 (AR000492-AR000493), 26 (AR000494-AR000515).

Just prior to the August IEP, AC's mother indicated that she was concerned that AC had dyslexia.  Hr'g Tr. 582:21-583:3; see also HCPS Ex. 27 (AR000516-AR000517).  The document from the Riverside School that Ms. Crowe provided, however, did not mention the word "dyslexia."  Hr'g Tr. 583:4-20; see also HCPS Ex. 24 (AR000487-AR000491).   The IEP team held meetings in September and October as a part of a continuing evaluation of AC.  Hr'g Tr. 583:21-23; 585:3-8.  At a meeting in November 2019, the IEP team found AC eligible for IDEA services under the category of Specific Learning Disability based on new data.  Hr'g Tr. 585:17-25; see also HCPS Ex. 38 (AR000583-AR000589).   AC was still eligible under Other Health Impairment for her ADHD.  Hr'g Tr. 586:1-4.  Because the prior IEP already addressed AC's needs by providing services for reading, math, and attention, and those services were based on the student's needs not her disability category, the additional disability eligibility did not necessitate a change in AC's IEP.  Hr'g Tr. 587:1-19; see also HCPS Ex. 38 (AR000583-AR000589).

HCPS, however, provided additional accommodations, including an amplification system so that AC could hear her teacher better.  Hr'g Tr. 596:6-18.  It also provided her with assignments on one-sided copies.  Hr'g Tr. 715:15-716:2; HCPS Ex. 23 (AR000468-AR000486).

During the COVID-19 closure from March 2019 through the fall, no elementary schools in HCPS were engaging in new instruction when the buildings were closed for COVID-19.  Hr'g Tr. 601:14-20.  Modrak testified that as an expert educator and in school administration, to her knowledge IEP services are not required to be provided when there is not instruction taking place.  Hr'g Tr. 602:23-603:2; 660:8-17; 665:3-8.  HCPS offered AC a temporary learning plan

to maintain her skills while schools were closed.  Hr'g Tr. 600:15-602:6; HCPS Ex. 44 (AR000604-AR000606).

AC's final third-grade report card had mostly As and one B.  Hr'g Tr. 604:9-10.  A low fluency score prevented a finding that AC was reading on grade level.  Hr'g Tr. 606:2-4.  She had no problem with comprehension, which is the more important component of reading.  Hr'g Tr. 607:19-608:16.

## II.    Rebecca Hodell, Dyslexia Advisor

Rebecca Hodell, HCPS's Dyslexia Advisor, testified on June 23-24, 2021.  She had been the Dyslexia Advisor for three years.  Hr'g Tr. 815:16-23.  She previously was a literacy coach and teacher at Highland Springs High School.  Hr'g Tr. 815:24-816:6.  Her resume was presented to the hearing officer during her qualification testimony.  Hr'g Tr. 816:20-817:1; HCPS Ex. 76, at 5-6 (AR000895-AR000896).  She is endorsed as a reading specialist.  Hr'g Tr. 816:14-19; 822:15-17.  She has been trained in the Orton-Gillingham method of reading intervention.  Hr'g Tr. 821:11-13.  She is a certified literacy specialist encompassing dyslexia and endorsed by the Commonwealth of Virginia.  Hr'g Tr. 821:19-822:14.  She was qualified as an expert in reading, literacy, and dyslexia.  Hr'g Tr. 817:7-11; 823:20-24.

In general, Hodell, based on her own personal work with AC and her review of AC's file, believes that AC was making progress in a public day school setting, i.e., at Pinchbeck Elementary.  Hr'g Tr. 827:16-828:3.  Hodell testified:

> [AC] is making growth in all areas of literacy, specifically in decoding. . . . [where she is] on grade level.  She is able to read accurately on grade level text.  She remained moderately slow in her rate; however, she has made progress throughout this school year and from the previous school year.  And she is, again, moderately low in her spelling knowledge; however, she has made progress in her spelling knowledge throughout this school year and the previous school year.

16

Hr'g Tr. 829:15-830:2.  AC has made progress and is performing better than most students with dyslexia.  Hr'g Tr. 837:16-23.

Hodell testified that she had consulted with AC's teachers "about appropriate instructional methods and goals for consideration by IEP team, progress monitoring tools and data."  Hr'g Tr. 824:18-22.  Contrary to the contentions of the student's witnesses and advocate, Hodell suggested utilizing Orton-Gillingham with AC because students with dyslexia respond well to Orton-Gillingham-based methods.  Hr'g Tr. 825:3-11.  HCPS has "many teachers who are trained in using Orton-Gillingham-based instruction and in other programs."  Hr'g Tr. 892:23-25.  Orton-Gillingham is an approach to literacy instruction and not a scripted program. Hr'g Tr. 825:12-15, 22-24.  Teachers are expected to use their various methods of Orton-Gillingham obtained through their training with their students.  Hr'g Tr. 827:8-15.

AC's reading comprehension is the same or similar to those of her nondisabled peers on grade level.  Hr'g Tr. 833:18-22.  In fact, AC can read on grade level as demonstrated by Hodell's assessment and other information in AC's file, particularly testing (specifically the Wide Range Achievement Test (WRAT)) performed in January 2021 by New Community, i.e., the school that AC's parents want her to attend because of its purported expertise in reading. Hr'g Tr. 834:14-19; 838:16-840:4; HCPS Ex. 98, at 27 (AR001295).  AC's score of 4.9 on the WRAT in January of her fourth-grade year meant that she was actually four months ahead of schedule.  Hr'g Tr. 839:21-840:4; HCPS Ex. 98, at 27 (AR001295).  The couple of scores at third-grade levels equate to AC being a little slower than the average fourth-grade student with sight words, which is typical for a student with dyslexia.  Hr'g Tr. 840:5-15.  Hodell explained that the data gathered by Terri Crenshaw, the reading specialist teaching AC, shows that AC is performing at the expected level in reading for someone of her age and grade level except in

17

spelling which is moderately behind.  Hr'g Tr. 836:15-837:17; HCPS Ex. 70 (AR000838-AR000864).

Hodell testified that she is familiar with New Community and its teaching methods.  Hr'g Tr. 840:17-25.  New Community is a private school, as opposed to a private day school, which means that it does not have accreditation from the Virginia Department of Education and would not have to follow an IEP drafted by a public school division for one of its students; a private day school would be accredited and would follow the IEP.  Hr'g Tr. 842:5-16; 843:5-8.

AC is behind in spelling because her test results show she spells at an early fourth-grade level, and she has just finished fourth-grade.  Hr'g Tr. 830:3-7, 21-25.  According to Hodell, being moderately behind for spelling and reading rate is not unusual for a student with dyslexia because the last area of reading and literacy is based on orthographic knowledge, i.e., the ability to remember exact spelling.  Hr'g Tr. 831:8-21.  Meeting this challenge slows down reading rate and makes spelling more difficult.  *Id.*

Hodell addressed the testing performed by Children's Hospital in 2020 that Rebecca Crowe found significant.  Ms. Crowe mentioned these testing results in an email to Hodell in September 2020.  HCPS Ex. 52 (AR000684- AR000689).  She stated that a comparison of results of the PAST test from 2019 and 2020 showed that AC "hasn't made any progress" and was reading on a second-grade level heading into fourth-grade.  *Id.* at 3 (AR000686).  Hodell explained that the test in question only measures one component of reading (phonological awareness) and that it was concerning that Ms. Crowe "believed that this one assessment could determine whether or not [AC] had made progress in reading overall."  Hr'g Tr. 849:10-850:16. Hodell further explained that the failure of AC and her parents to take advantage of support

offered by HCPS when schools closed in March 2020 could have caused AC to regress.  Hr'g Tr. 847:8-23; 850:18-851:1.

In early fall of 2020 Hodell met with Ms. Crowe and agreed to do additional testing. Hr'g Tr. 851:25-852:7.  Hodell produced a report of her assessments done after the first two weeks of school.  Hr'g Tr. 854:3-10; HCPS Ex. 54 (AR000717-AR000718).  Hodell administered the QRI 6 which is a measure to see how well the student transfers their foundational reading knowledge into connected text.  Hr'g Tr. 854:16-20.  This test shows how accurately student is reading, their reading fluency (rate), and their level of comprehension.  Hr'g Tr. 854:11-20.  Hodell testified: "I . . . gave [AC] the QRI-6 in which I asked her to read a third grade passage, a fourth grade passage and a fifth grade passage.  Based on the results of her ability to read those, I determined that she was reading at grade level."  Hr'g Tr. 855:20-24. Specifically, she was on the cusp between third and fourth-grade, exactly where she would be expected to be at the start of her fourth-grade year.  Hr'g Tr. 855:24-856:4.  AC was instructional on the fourth-grade level, which means that she should be able to work with fourth-grade text with proper support.  Hr'g Tr. 856:5-12; 858:16-859:5.

Hodell's assessments showed that AC was reading independently at the third-grade level because she read a third-grade text with 98 percent accuracy. Hr'g Tr. 857:15-858:15. She only missed one comprehension question without being allowed to look back at the text.  Hr'g Tr. 859:19-860:8.  AC was functioning at a reading level expected for her age and grade level as a beginning fourth grader.  Hr'g Tr. 859:7-18.  AC could write at grade level.  Hr'g Tr. 861:3-4.

Hodell's testimony addressed Ms. Crowe's contention that Hodell graded the QRI incorrectly.  She testified that while "the manual for the QRI-6 does require a hundred percent comprehension in order for the student to be considered to be independent," it was her "opinion

that a student who is able to answer seven out of eight questions is independent." Hr'g Tr. 861:19-862:1. The fact that she provided AC a "mid-year fourth grade" text at the beginning of the fourth-grade year further influenced her conclusions. Hr'g Tr. 862:6-13. Regardless of the scoring method used, the test results showed that AC was making progress with HCPS. *Id.* at 17-21. Hodell testified on cross-examination: "I have not changed the results of the QRI in . . . any way." Hr'g Tr. 903:23-24.

AC could retell the third and fourth-grade text appropriately in Hodell's testing from September 2020. Hr'g Tr. 1003:18-21. Hodell explained that she did not include this information in the report because the retelling portion of the QRI is a very subjective measure and she focuses on the objective measures for her report. Hr'g Tr. 1004:1-3.

Hodell administered a phonics assessment using nonsense words and AC scored 93% on that assessment showing she has strong phonics knowledge and is able to apply to unknown words. Hr'g Tr. 855:5-19. Hodell administered a Developmental Spelling Assessment. AC was at the "mid-Within Word" stage which corresponds to a second to fourth-grade spelling level. Hr'g Tr. 856:13-16.

AC's test results were very good for a student with dyslexia. Hr'g Tr. 860:24-861:8. They indicated she was making progress in Henrico County Public Schools. Hr'g Tr. 861:5-8. Previously she had been reading at an end of second-grade level and is now reading between a third and fourth-grade level or fourth-grade instructional level. Hr'g Tr. 862:17-863:2.

Both the Children's Hospital testing and Hodell's assessments showed that AC had mastered decoding. Hr'g Tr. 867:21-24; HCPS Ex. 50 (AR000675-AR000681); HCPS Ex. 54 (AR000717-AR000718). They also showed AC had mastered phonics with a weakness in multi-syllable word decoding that was being addressed during the 2020-2021 school year. Hr'g Tr.

20

867:25-868:5; HCPS Ex. 50 (AR000675-AR000681); HCPS Ex. 54 (AR000717-AR000718).

Both reports indicate that AC's orthographic knowledge is average but still developing.  Hr'g Tr.

868:6-12; HCPS Ex. 50 (AR000675-AR000681); HCPS Ex. 54 (AR000717-AR000718).

Hodell administered another PAST test to AC in December 2020.  Hr'g Tr. 868:22-

869:1; HCPS Ex. 59 (AR000736-AR000737).  This test looks for "foundational ability to

manipulate sounds, which helps students to apply phonics and read at a good rate and fluently."

Hr'g Tr. 869:18-21.  This test found that AC was "both able to manipulate the sounds and the

words that are tested" and to do so automatically, i.e., within two seconds up until Level K on the

test.  Hr'g Tr. 869:22-870:19.  The results of HCPS's December 2020 PAST showed that AC

had made progress from September to December 2020.  Hr'g Tr. 871:6-9.

In January 2021, Hodell explained to AC's mother her interpretation of the data after

AC's mother challenged the data.  Hr'g Tr. 864:25-865:17; HCPS Ex. 64 (AR000783-

AR000788).  Hodell explained to AC's mother that Fontas & Pinnell Data, another reading level

assessment, showed the same reading level which was end of third/beginning of fourth-grade.

Hr'g Tr. 865:18-866:14.

Through email, AC's parent contested the results of Hodell's PAST that she had

observed.  Hr'g Tr. 871:20-872:9; HCPS Ex. 83 (AR001034-AR001043).  AC reported results

from a PAST given by Children's Hospital two weeks earlier.  Hodell found the results similar

within two levels from what she could see.  Hr'g Tr. 873:7-24.  The results of Children's

Hospitals assessment in December showed that AC had made progress.  *Id.* at 18-24.

According to Hodell, the goals for reading and spelling in the January 2021 IEP are

appropriate for AC.  Hr'g Tr. 878:5-24; HCPS Ex. 61 (AR000742-AR000772).  The goals allow

for AC to make meaningful educational progress.  Hr'g Tr. 878:25-879:4.  The goals provide AC
with a Free Appropriate Public Education regarding her reading instruction.  Hr'g Tr. 879:5-8.

      AC was making progress in spelling based on Ramos' data during the 2020-2021 school
year.  Hr'g Tr. 879:11-23; 880:23-24; HCPS Ex. 68 (AR000834).  AC was only able to spell one
long vowel word in September 2020 and by December 2020 she could spell four out of five
correctly.  Hr'g Tr. 880:8-13.  For complex consonants like T-C-H, she could only spell two in
September 2020 and by December 2020 she could spell four out of five correctly.  *Id.* at 14-18.
For ambiguous vowels, such as O-I in coin, she could only spell one in September 2020 and four
in December 2020.  *Id.* at 19-22.

      Data captured by the AimswebPlus progress monitor shows AC was making progress in
the area of fluency for the school year 2020-2021.  Hr'g Tr. 881:7-883:3; HCPS Ex. 72
(AR000869-AR000876).  Her reading fluency had increased from 78 words per minute to 128
words per minute.  Hr'g Tr. 883:4-12.  There is some normal fluctuation with an average rate of
change progression.  *Id.* at 13-24.

      AC will retain characteristics of dyslexia in her reading even when fully remediated.
Hr'g Tr. 884:1-9.  Likely areas AC may still exhibit signs include reading at a slower rate than a
nondisabled peer and less correct spelling.  Hr'g Tr. 884:10-17.

      A slower reading rate can be accommodated in a public-school classroom.  Hr'g Tr.
887:5-9.  Hodell opined that AC does not need to go to New Community school or any other
private school for students with dyslexia for her to continue to make meaningful progress.  Hr'g
Tr. 886:7-20; 886:24-887:1.

While AC is mildly below grade level in phonological awareness, she reads grade level text. Hr'g Tr. 956:5-9. Her phonological awareness has improved evidenced by her improvement in spelling and fluency. *Id.* at 9-12.

On cross-examination, Hodell testified that members of AC's IEPs had an adequate background in dyslexia. Hr'g Tr. 948:15-949:8. For instance, she stated, "teachers who have had training in Orton-Gillingham were part of the team, and so they are able to speak to the instructional needs of a student with dyslexia." Hr'g Tr. 949:1-4.

### III.    Jessica Alfasi, Special Education Teacher (Third-Grade)

Jessica Alfasi testified on June 24, 2021. Alfasi has a bachelor's degree in elementary education and a master's degree in special education. Hr'g Tr. 1026:14-16; see also HCPS Ex. 76, at 16 (AR000906). She has Virginia teaching licenses in kindergarten through sixth-grade and special education, kindergarten through twelfth-grade. Hr'g Tr. 1026:19-21; see also HCPS Ex. 76, at 16 (AR000906). She has written IEPs. Hr'g Tr. 1027:24-1028:1; HCPS Ex. 76, at 15 (AR000905). The Hearing Officer qualified her as an expert in special education, Hr'g Tr. 1030:18-20, and general elementary-school education. Hr'g Tr. 1031:3-8.

Alfasi was a part of AC's first eligibility meeting. Hr'g Tr. 1031:18-20. After considering a hearing screening, a social evaluation and a psychological evaluation, the eligibility team determined that AC was a student with a disability under Section 504 of the Rehabilitation Act. Hr'g Tr. 1032:4-23; HCPS Exs. 3 (AR000352), 4 (AR000353-AR000358); Hr'g Tr. 1033:17-1034:6; HCPS Ex. 5 (AR000359-AR000368). Despite finding some deficits, the team did not conclude that AC needed special education services under the IDEA. Hr'g Tr. 1034:7-1035:10; HCPS Ex. 6 (AR000369-AR000375). The eligibility team determined that

performance on the Woodcock-Johnson reading test showed "no significant, overall deficits in specific areas in reading." Hr'g Tr. 1039:14-17; see also HCPS Ex. 6 (AR000369-AR000375).

In June 2019, Alfasi was a part of the eligibility team that found AC eligible for services under the IDEA for Other Health Impairment.  Hr'g Tr. 1041:24-1042:14; HCPS Ex. 17 (AR000407-AR000411).  The team determined that AC had low reading scores because of her ADHD.  Hr'g Tr. 1042:15-1043:5; HCPS Ex. 17 (AR000407-AR000411).  The eligibility team scheduled an IEP meeting within 30 days of its finding as required by regulations, but AC's parents could not attend in person because of an out of country trip.  Hr'g Tr. 1044:12-1046:12.  Nevertheless, the IEP team was able to take into consideration input from the parents.  Hr'g Tr. 1046:13-19; 1049:9-1050:5; HCPS Ex. 20 (AR000418-AR000421); Hr'g Tr. 1050:19-24; HCPS Ex. 23, at 2-3 (AR000469-AR000470).

The IEP developed by the team and signed by AC's parents on August 29, 2019 addressed AC's deficits in reading and math.  Hr'g Tr. 1054:7-19; 1055:2-5, 15-23; 1056:10-23; HCPS Ex. 26 (AR000494-AR000515); see also Hr'g Tr. 1065:4-1067:24.

Similarly, an IEP drafted in part by Alfasi and offered to AC's parents in December 2019 addressed AC's deficits in reading and math.  Hr'g Tr. 1061:16-1062:9; 1063:11-1064:6; HCPS Ex. 89 (AR001146-AR001170); Hr'g Tr. 1064:14-24.

During the 2019-20 school year, Alfasi provided reading instruction to AC and helped her work towards her fluency goal.  Hr'g Tr. 1056:24-1057:4.  She used an Orton-Gillingham approach, which AC's mother observed on one occasion.  Hr'g Tr. 1057:5-1060:17.

AC's report card for the 2019-20 school year did not indicate that she was struggling in school.  Hr'g Tr. 1069:2-1070:5; HCPS Ex. 46 (AR000609-AR000610).  AC's reading skills were on grade level for accuracy and comprehension, but "slightly below" for fluency.  Hr'g Tr.

24

1070:6-16.  While AC's teacher consequently marked her as reading below grade level, Alfasi, who is trained by the Virginia Department of Education as an Orton-Gillingham teacher, testified, "Comprehension is our end goal. . . . [AC] was reading and comprehending on grade level."  Hr'g Tr. 1070:22 -1072:18.  AC's fluency, specifically, increased during the 2019-20 school year.  Hr'g Tr. 1073:1-1074:8.  Alfasi testified that the IEPs she helped to draft were reasonably calculated to help AC make meaningful educational progress.  Hr'g Tr. 1074:24-1075:8.

AC did not need Extended School Year Services after the 2019-20 school year because she was "making progress on her IEP goals at the time of the school closure [for COVID] in March."  Hr'g Tr. 1075:19-1076:1; HCPS Ex. 49 (AR000618-AR000631).

## IV.  Virginia Ramos, Special Education Teacher (Fourth-Grade)

Virginia Ramos is a special education teacher employed by HCPS to work at Pinchbeck Elementary School.  Hr'g Tr. 1165:20-1166:2.  She has a bachelor's degree and is "working on" a master's degree in special education.  Hr'g Tr. 1166:20-23.  She is licensed as a teacher and has training in Orton-Gillingham.  Hr'g Tr. 1166:24-1167:20.  She has a provisional licensed to work as a special education teacher.  Hr'g Tr. 1225:6-8; see also HCPS Ex. 76, at 14 (AR000904).

During the 2020-21 school year, Ramos was AC's special education teacher and case manager.  Hr'g Tr. 1168:7-21.  Based on her interaction with AC and various test scores and data points, she determined that AC could read on grade level, i.e., a fourth-grade level at the end of her fourth-grade year.  Hr'g Tr. 1169:17-19; 1238:12-18.

Ramos spent an hour and fifteen minutes to two hours a day with AC.  Hr'g Tr. 1256:20-23.  Each day, she would spend three to five minutes doing a check-in one on one with AC prior

to spending fifteen minutes doing one on one reading instruction with her; on Wednesdays, she would spend an hour doing reading instruction.  Hr'g Tr. 1257:3-22.  AC received 300 minutes of direct instruction each week.  Hr'g Tr. 1262:4-7.

A developmental spelling assessment for AC shows progress from September 21 to December 11, 2020.  Hr'g Tr. 1175:11-1176:15; see also HCPS Ex. 68 (AR000834).  Although it shows some regression in one category, that regression is insignificant.  Hr'g Tr. 1176:16-25.  Ramos also tested AC's reading fluency on a weekly basis and her results showed progress overtime despite some variability.  Hr'g Tr. 1177:1-1179:23; HCPS Ex. 72 (AR000869-AR000876).

During the course of the school year, Ramos conducted frequent "probes" of AC to track her progress towards her IEP goals.  Hr'g Tr. 1186:3-9.  Such "probes" include spelling and reading assessments.  Hr'g Tr. 1185:13-20.

Ramos has observed AC's IEP implemented with fidelity because Ramos and AC's other teachers have implemented the goals and accommodations and provided the services in the IEPs.  Hr'g Tr. 1187:5-25.

Ramos provided math instruction to AC in conjunction with her general education teacher.  Hr'g Tr. 1197:13-20.  In this capacity, she provided visual aids to AC as an accommodation required by her IEP.  Hr'g Tr. 1197:13-1199:10; HCPS Ex. 85 (AR001070-AR001104).

Ramos attempted on several occasions to set up a meeting with AC's parents to discuss Extended School Year Services, but the parents failed to respond in a substantive fashion.  Hr'g Tr. 1201:8-17; 1202:9-19; HCPS Ex. 86, at 3, 17 (AR001107, AR001121); Hr'g Tr. 1307:12-19.

26

Ramos participated in three IEP meetings for AC in December 2020 and January 2021. Hr'g Tr. 1209:25-1210:7. Ramos prepared the draft IEP, along with other teachers, that was discussed at these meetings based on data collected by other teachers and herself. Hr'g Tr. 1211:16-1212:14. Her intention was to create an IEP that would enable AC to make more than minimal educational progress. Hr'g Tr. 1214:7-13, 23; 1235:6-8; 1236:3-14; 1236:25-1237:2. In December AC's parents and advocates generally agreed with what HCPS proposed, but AC's mother sought to undo the IEP team's work. Hr'g Tr. 1210:8-12; 1210:23-1211:7; 1211:13-15; 1214:25-1215:9; 1215:15-18; 1216:13-1217:4. HCPS sought to have AC return to school for in-person instruction, but AC's parents refused. Hr'g Tr. 1217:10-1219:14. After meeting six and a half to seven hours to finalize the IEP, AC's parents stated that HCPS could not implement the proposal. Hr'g Tr. 1219:15-22. They rejected the proposed IEP. Hr'g Tr. 1242:8-1243:24.

Ramos believes AC's consented to IEPs have been implemented and that AC has made educational progress during the time Ramos was AC's teacher. Hr'g Tr. 1221:11-13, 18; 1222:4-6, 12-13.

AC's parents never mentioned The New Community School during any IEP meeting. Hr'g Tr. 1305:16-23; 1306:12-22.

## V.      Ginger Sanderson, Exceptional Education Coordinator

Ginger Sanderson testified on July 14, 2021, the last day of the administrative hearing. She has been an Exceptional Education Coordinator for HCPS since 2010. Hr'g Tr. 1334:1-8. Previously, she was an exceptional education resource teacher focused on reading. *Id.* at 9-13. She has taught special education to preschool students and has taught at the college level. *Id.* at 14-17. She has a teaching license in exceptional education K-12 in Specific Learning Disabilities and emotional disabilities. Hr'g Tr. 1334:21-1335:2. She also has a general

27

education certification through fourth-grade.  Hr'g Tr. 1335:2-4; see also HCPS Ex. 76, at 17-18 (AR000907-AR000908).  Sanderson was honored at the International Council for Learning Disabilities. Hr'g Tr. 1335:20-25; HCPS Ex. 76, at 18 (AR000908).  She was qualified as an expert by the hearing officer in reading education and exceptional education.  Hr'g Tr. 1340:19-21; 1341:1-4.

Based on Sanderson's review of AC's records, specifically the progress related to AC's IEP goals, she believes AC reads on a fourth-grade level.  Hr'g Tr. 1343:15-22; 1344:17-20.

In Sanderson's expert opinion, AC has made progress in Henrico County Public Schools. Hr'g Tr. 1344:21-23.  She believes that the IEP offered to AC in late January 2021 would have provided AC with FAPE and allowed her to continue to make meaningful educational progress in HCPS.  Hr'g Tr. 1377:6-15; see also HCPS Ex. 67 (AR000803-AR000833).  Further, AC does not need a private school for students with dyslexia to make progress because her current reading level and her data shows she is trending with progress. Hr'g Tr. 1345:9-16.  Sanderson does not believe that the New Community School can offer more intensive educational services to AC than HCPS because she believes that HCPS has the same programming and services within the school system, including individuals trained in Orton-Gillingham. Hr'g Tr. 1402:7-17. Sanderson does not believe a private school would be able to offer more services than is offered in the IEP proposed by HCPS.  Hr'g Tr. 1378:9-19.  She explained that AC is at grade level for reading and for comprehension and her IEP is very robust and she has had good instruction.  *Id.*

Sanderson explained a hallmark for making progress is based on looking at lots of different data points to be sure that the kid has reading knowledge and is showing consistently on different data points. Hr'g Tr. 1346:2-11.

28

Sanderson attended three IEP meetings for AC during the 2020-2021 school year.  Hr'g Tr. 1349:1-5.  The IEP team drafted the December 2020 IEP based on data collected by HCPS as well as information that the parents brought at that time from the Children's Hospital.   Hr'g Tr. 1350:15-1351:2.  At the January 2021 IEP meeting, Sanderson and Ramos requested that AC return to school in person as soon as it was possible and that AC begin to come in for some in-person support.  Hr'g Tr. 1353:12-1354:5.  Sanderson explained that the January 2021 IEP contains the QRI data indicating that AC was at an instructional reader on the third-grade level, which according to Sanderson was where she was supposed to be at that time.  Hr'g Tr. 1357:1-1359:18; HCPS Ex. 67 (AR000803-AR000833).  The QRI where student scored 3.9, third-grade ninth month was from September 21, 2020.  Hr'g Tr. 1362:23-1363:14.

The draft IEPs from December 2020 and January 2021 (as well as other IEPS) included accommodations to address AC's central auditory processing disorder.  Hr'g Tr. 1363:16-1364:5. The accommodations proposed for AC are the same or similar to the ones that are recommended by the American Speech and Hearing Association. Hr'g Tr. 1376:2-7.

In Sanderson's expert opinion, the IEP that was offered in late January 2021, which was based on the December and January meetings, would provide AC with FAPE and would allow her to make meaningful educational progress. Hr'g Tr. 1377:6-15.  To her knowledge AC's last consented to IEP was being implemented with fidelity. Hr'g Tr. 1380:6-18.

## VI.    Terri Crenshaw, Fourth-Grade Teacher

Terri Crenshaw also testified on July 14 as the last School Board witness.  She has been an Exceptional Education Teacher, grades K-5, for 17 years.  Hr'g Tr. 1449:10-17.  Crenshaw has a teaching license that is a collegiate certificate for Specific Learning Disability for K-5 grades.  Hr'g Tr. 1449:18-21.  Crenshaw is certified in Orton-Gillingham.  Hr'g Tr. 1450:16-18;

HCPS Ex. 76, at 7 (AR000897).  Crenshaw's certification for Orton-Gillingham consisted of training at Riverside School and two trainings with VDOE, where a fellow followed her through 30 hours of training.  Hr'g Tr. 1450:20-1451:1.  Crenshaw has had subsequent refreshers in Orton-Gillingham almost yearly since 2012.  Hr'g Tr. 1453:7-11.  Crenshaw was qualified by the hearing officer as an expert in exceptional education and reading.  Hr'g Tr. 1454:11-12, 22-23.

Crenshaw was AC's teacher starting in November 2020 and was one of the teachers that collected data on AC.  Hr'g Tr. 1455:2-14.

Crenshaw stated based on her experiences with AC and the data, AC was reading on a fourth-grade level.  Hr'g Tr. 1455:15-18.  Crenshaw stated based on her experiences with AC and the data she collected in HCPS Exhibit 70, AC was making meaningful educational progress on the goals she was addressing.  Hr'g Tr. 1455:19-21; 1456:2-5, 15-19; HCPS Ex. 70 (AR000838-AR000864).  Crenshaw stated "from the baseline data to where she was at the end of the third nine weeks . . . she progressed. . . . there was an increase in the data across the data points."  Hr'g Tr. 1456:21-25; HCPS Ex. 70 (AR000838-AR000864).

Crenshaw stated that AC was achieving some of the goals at almost a hundred percent; specifically, she was achieving goals number 5, 6, and 7 at this level.  Hr'g Tr. 1457:1-4, 9-24; HCPS Ex. 70 (AR000838-AR000864).  Crenshaw opined that based on her experience as an exceptional education teacher and a reading teacher, AC was making meaningful progress on goal number 5 even though "decoding is a more difficult task for students."  Hr'g Tr. 1457:25-1458:7; HCPS Ex. 70 (AR000838-AR000864).

Crenshaw was giving AC one on one virtual instruction.  Hr'g Tr. 1499:14-17.  Crenshaw stated that AC has been late about 2-3 times a week for approximately 5 to 15 minutes for their reading sessions since the filing of the due process in March until the end of the school year.

Hr'g Tr. 1458:8-22; 1459:21-24. Crenshaw's reading sessions with AC are 45 minutes. Hr'g Tr. 1459:25-1460:2. Crenshaw stated AC also missed approximately 3-4 reading sessions. Hr'g Tr. 1460:3-8. Crenshaw opined that AC would have made even more progress than what was reported in HCPS Exhibit 70 if she didn't miss her reading sessions. Hr'g Tr. 1460:24-1461:10.

HCPS proposed to have AC return to in-person learning in January 2021. Hr'g Tr. 1462:16-19. Crenshaw believed it would have been beneficial for AC to return to in-person learning because "there are more resources" such as "manipulatives to help her with the reading" and "being able to read with a teacher right in front of her or beside her to help her with oral reading fluency". Hr'g Tr. 1462:20-1463:7. Crenshaw was implementing the last consented to IEP when she was working with AC. Hr'g Tr. 1463:8-13. Crenshaw was providing FAPE since she has been working with AC. Hr'g Tr. 1463:14-17.

Crenshaw opined that if AC "met the criteria for home-based" services, "then it would have to be offered. Because [AC] did not meet the criteria, it was not offered." Hr'g Tr. 1468:6-9. Crenshaw stated that "students that do qualify for home-based instruction have either severe handicaps or they have severe behavioral issues that could either harm themselves or harm someone in the school." Hr'g Tr. 1468:24-1469:6. To Crenshaw's knowledge, other students who were still learning at home were not receiving home-based instruction virtually one on one. Hr'g Tr. 1499:18-22.

Crenshaw stated that she has "mentioned to [AC's] mother and to the [IEP] team how beautifully [AC] reads and how fluent she is." Hr'g Tr. 1480:15-16. Crenshaw wanted to record AC reading some stories for Crenshaw's students who don't read as fluently as AC so they could hear a fluent reader. Hr'g Tr. 1481:5-15.

Crenshaw opined that AC has advanced from the phoneme awareness part but reading comprehension is going to be a continuum.  Hr'g Tr. 1484:4-18.  Crenshaw stated that "reading and comprehending are two separate things.  Reading, I can decode.  Comprehending, I can understand."  Hr'g Tr. 1485:16-18.  Crenshaw stated that AC can decode on a fourth-grade level. Hr'g Tr. 1485:21-22.

Crenshaw stated that AC's oral reading fluency is on a fourth-grade level.  Hr'g Tr. 1486:1-2.  Crenshaw had AC do repeated readings because it increases your oral reading fluency. Hr'g Tr. 1495:10-1496:3.

**Student's Rebuttal Case**

**I.     Debra Tisler, Expert**

In her rebuttal case, AC brought back Debra Tisler to discuss testing of AC that Tisler had conducted on June 28-29, 2019, after the commencement of the due process hearing.  Hr'g Tr. 1504:17-21.  She performed a QRI assessment and found deficiencies in AC's reading ability.  Hr'g Tr. 1506:5-1508:13.  Tisler testified that AC was not on grade level for fluency, reading comprehension, decoding, or vocabulary.  Hr'g Tr. 1509:20-1510:6.  Consequently, AC cannot access the general curriculum in reading.  Hr'g Tr. 1510:7-17.  Tisler also testified, without any foundational support, that AC was myopic.  Hr'g Tr. 1510:18-1513:5.

Tisler testified again that HCPS could not address these deficits.  Hr'g Tr. 1508:14-23. She stated, for the first time, that she supported the effort of AC's parents to have her placed at New Community where AC would have the opportunity to catch up on her reading "because their programming, what they will be implementing directly is for the – for her unique needs is scientifically research based and peer reviewed."  Hr'g Tr. 1513:6-1514:1.  She provided no basis for this testimony nor did she testify about how much instruction at New Community

would be needed to compensate AC for HCPS's alleged inadequacies.  She did not testify about any costs associated with private placement.  She did not testify about any other possible private placements for AC or whether New Community was better or equivalent to them.

Tisler conceded on cross-examination that her analysis was not complete and she had not composed a final report because she needed some additional information from HCPS.  Hr'g Tr. 1521:10-1522:18.  She further testified that she did not disagree with New Community's testing, which indicated that AC was reading on a 4.9 grade level and spelling at a 4.0 grand level in January 2021.  Hr'g Tr. 1527:8-1529:2.  HCPS objected to Tisler's rebuttal testimony since her assessment of AC was done after the due process was filed and the results had not been shared with the school division.  Hr'g Tr. 1505:6-16

## II.     Lee Crowe, AC's Father

AC's father, Lee Crowe, testified that AC should be educated at New Community because "we've had a really strong feeling that that is the place that she needs to be."  Hr'g Tr. 1531:7-23.  He provided no further information of any sort about New Community.

### Hearing Officer's Commentary

Throughout the eight-day virtual hearing the Hearing Officer provided the following commentary on the virtual nature of the hearing.  On the first day of the virtual hearing, the Hearing Officer commented "I think you understand that I find this method of holding a hearing despicable."  Hr'g Tr. 27:8-10.  He further went on to state, "We do the best we can. I would urge you and any other school boards anywhere to try to come up with an alternative."  *Id.* at 12-14.  The Hearing Officer and Court Reporter discussed who appeared on the screen, the size of the images, and the orientation throughout the first day.  See Hr'g Tr. 26:12-27:3; 33:18-35:12; 35:21-36:8; 42:2-15; 82:11-83:17.  In particular, during Ms. Crowe's testimony, the Hearing

Officer commented, "Stop right there. I assume she's going to testify.  I have no picture of her if that is important. And [HCPS Attorney] Ms. [Nicole] Thompson's picture has disappeared." Hr'g Tr. 82:11-14.  After the Hearing Officer expressed additional questions about the screen and his view, Kandise Lucas, the plaintiff's advocate asked the Hearing Officer, "Mr. Francis, do you want me to send you a YouTube video on Zoom?"  Hr'g Tr. 140:22-23.  The Hearing Officer declined the offer but went on to state, "Let me make another observation about this miraculous way that we are [d]oing this.  Up to this point Mr. Crowe's picture beside his wife had disappeared and gone in and out as if – there he goes. He disappears like a ghost, and then he comes back again.  I just note that for the record if it ever goes any further as to any type of virtual hearing."  Hr'g Tr. 141:14-21.

On the third day of the hearing, while HCPS counsel was examining Sarah Modrak, the Court Reporter interjected to state, "Counsel, I hate to interrupt, but you're going to need to stop a second. Mr. Francis dropped out."  Hr'g Tr. 480:9-11.  After a break the Hearing Officer rejoined the virtual hearing.  Thompson asked, "Mr. Francis, where did you drop off?"  Hr'g Tr. 480:13-14." The Hearing Officed replied, "I do not know."  Hr'g Tr. 480:15.  Thompson follow up by asking, "What was the last thing you heard?"  Hr'g Tr. 480:16-17.  The Hearing Officer responded, "I do not know."  Hr'g Tr. 480:18.  Thompson asked, "Do you recall us starting with Exhibit 9?"  Hr'g Tr. 480:19-20.  The Hearing Officer responded, "No. I heard somebody say we have a technical issue and then my screen went blank and a little circle went around for about ten minutes and that was it and then it all went away."  Hr'g Tr. 480:21-25.  In response to the Hearing Officer's question, "did you-all not know that the hearing officer was now no longer in the hearing," the court reporter opined that there was likely an internet issue and ultimately suggested that the Hearing Officer also connect via telephone.  Hr'g Tr. 481:8-482:24.  However,

the Hearing Officer stated, "I'm not going to go ahead with the hearing when I can't even see anybody.  That is not acceptable."  Hr'g Tr. 484:6-8.  The Court Reporter indicated he would pin the Hearing Officer on his screen to monitor and be sure the Hearing Officer was not dropped from the hearing.  Hr'g Tr. 485:1-5.

On the fourth day of the hearing, the Hearing Officer expressed his preference that the remaining hearing days be held in person.  Hr'g Tr. 548:16-549:4.  The Hearing Officer indicated that he found "this virtual hearing format for doing this just totally unacceptable" and indicated:

> [W]hat I would like you to explore before we set these three more days – And I don't see why there would not be. If we put this off for a month or more we could have it in-person, as it should be, which would be my preference.
>
> And I would rather have you all figure it out, that you agree or don't, and let me know.  Because it's very possible I could refuse to continue this hearing as a virtual hearing.

Hr'g Tr. 548:17-549:2.  In response to a discussion about the delay that would be required to switch to an in-person hearing, the Hearing Officer stated the following:

> You all must realize that this matter will be decided pretty much on the credibility of expert witnesses. And there's a whole lot of evidence back and forth with regard to the experts and how they came to their conclusions and whether or not they involved the parents in that decision-making, as they should have under the law.
>
> In other words, it's going to take a long time to do all of that. And that's just extremely difficult virtually. And by the way, it's not the screen problem. It's just the simple problem of having space to know what anybody's talking about. It's the method that is used and can't be used any other way when it's a virtual hearing.
>
> And I just find that so unacceptable when trying to decide a case where it looks like it's going to come down to the credibility of witnesses and experts.

> So the circumstances and the environment are extremely, extremely important. And that's very cumbersome, hard to get it correct or a right feeling for it looking at a screen.

Hr'g Tr. 555:13-556:9.

After a lengthy discussion on the issue of proceeding virtually or in person, the Hearing Officer commented,

> Knowing my problems with this virtual hearing, and knowing that we have to select more time, I say if anyone wants to respond – No, I can't do it. Off the record, I could.

> But I believed it is – would be in [AC's] best interest if we have to continue the case for more time, and we do, to have the case continued in-person, as it should be. But you have your opinion and your reasons, Ms. Lucas, and I respect that.

Hr'g Tr. 564:4-14. The Hearing Officer proceeded to determine that the hearing would "proceed virtually, because that is what the student and the parents want to happen, and they believe it's in the best interest of the student, their child, and that's the positions. So I will do that, having made clear how I view that." Hr'g Tr. 564:18-23. Eventually the parents agreed to proceeding in person for the three additional days. Hr'g Tr. 572:20-21. However, because of the short notice Thompson explained, "we can try and get a space. But we can't guarantee in-person next week." Hr'g Tr. 572:22-24. The Hearing Officer requested that the parties do what they could to make it happen. Hr'g Tr. 575:20-21.

The Hearing Officer responded to Lucas' request to know what the witness was looking at stating, "Do the best you can. This is a virtual hearing. I agree. That's one of the reasons I don't like them." Hr'g Tr. 699:15-17.

On the fifth day, in response to Lucas' request that Ms. Thompson not interrupt her, the Hearing Officer demanded, "You-all stop. I don't know who's yelling and who isn't. We're watching this on a computer screen." Hr'g Tr. 900:25-901:2. Finally, on the sixth day, in

response to Lucas asking the Hearing Officer if he thought she was yelling at the witness, The Hearing Officer admitted, "Well, I can't tell because everybody else is on a small screen, with a tiny picture, and I'm not in the room with anybody.  So I'm having a difficult time telling whether anybody's yelling.  I don't know how--."  Hr'g Tr. 1101:15-21.

### Conclusion

After the hearing adjourned on July 14, 2021, the parties submitted closing briefs to the Hearing Officer, who issued a two and a half page ruling dated "Nunc Pro Tunc the 23rd of October, 2021," which the Henrico County School Board filed with the Court on June 14, 2022 as Document 17-1.

**Respectfully submitted,**

**HENRICO COUNTY SCHOOL BOARD**                    **AC by RC**

By: _____/s/_____              By: _____/s/ (with permission)____
John D. McChesney (VSB No. 44326)                    Jason M. Krumbein (VSB No. 43538)
Senior Assistant County Attorney                     Krumbein Legal Services, Inc.
County of Henrico                                    1650 Willow Lawn Dr. Suite 201
P.O. Box 90775                                       Richmond, VA. 23230
Henrico, VA  23273-0775                              Phone:  804-592-0792
Phone: (804) 501-4677                                Fax:  804-823-2565
Fax: (804) 501-4140                                  Email:  JKrumbein@KrumbeinLaw.com
Email: mcc121@henrico.us                             *Counsel for Plaintiff*
*Counsel for Defendant Henrico*
*County School Board*

**<u>Certificate of Service</u>**

I hereby certify that on the 27th day of January 2023, I filed a copy of the foregoing document using the Court's ECM/ECF filing system, which will send electronic notification to the following e-filing user:

>Jason Krumbein
>1650 Willow Lawn Drive
>Suite 201
>Richmond, VA 23230
>*Counsel for Plaintiff*

_____/s/_____
John D. McChesney (VSB No. 44326)
Senior Assistant County Attorney
Office of the County Attorney
County of Henrico
P. O. Box 90775
Henrico, Virginia 23273-0775
