**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**AC, a minor, by and through RC,
As parent and next friend,**

  **Plaintiff,**

**v.**             **Case No.: 3:22-cv-00336**
                **JURY DEMANDED**

**HENRICO COUNTY SCHOOL BOARD**

  **Defendant.**

<u>**SECOND AMENDED COMPLAINT**</u>

  **COME NOW,** the plaintiffs by and through their counsel and file herewith an Amended

Complaint which is being filed pursuant to a judicial phone conference on September 18, 2023,

where the Court gave the Plaintiffs 21 days to file a Second Amended Complaint due to the

addition of new counsel, and this Amended Complaint is being filed pursuant to that conference.

### I. JURISDICTION

The subject matter jurisdiction of this Court is invoked pursuant to the 14th Amendment to the

United States Constitution; 28 U.S.C. § 1331; 29 U.S.C. § 794(a); Individuals With Disabilities

Education Act ("IDEA"), 20 U.S.C. §1400 et seq.; and Title II of the Americans with Disabilities

Act ("Title II"), 42 U.S.C. §§ 12131 et seq..


Trial by Jury is demanded on all matters so triable.

### II. PARTIES

1)  Plaintiff, AC ("AC") is a minor child who at all times relevant herein, attended public

schools operated under the auspices of the defendant, Henrico County School Board.

2)      AC is a twelve-year-old female who has average ability, who has performed below grade level for reading, spelling, phonological awareness, and math because of her diagnosed disabilities including, Dyslexia, Attentional Deficit Hyperactivity Disorder (ADHD) and Auditory Processing Disorder.

3)      Plaintiff, R.C. ("RC") is AC's mother and next friend.

4)      Henrico County School Board ("HCSB") is the Local Education Agency ("LEA") and was at all times relevant herein the public school system where AC was placed for educational purposes by her parents.

### III. BACKGROUND FACTS

5)      On or about January 29, 2019, AC's parents enrolled AC in HCPS' Pinchbeck Elementary School.

6)      On or about February 15, 2019, AC scored 16% in reading and 36% in Math on HCPS' "Benchmark" tests.

7)      On or about March 28, 2019, a Child Find meeting was held which identified that AC had Hyperactivity/Impulsivity, Learning/Executive Functioning and Inattention which were associated with Attention Deficit Hyperactivity Disorder (ADHD).

8)      On or about March 28, 2019, the defendant provided higher scores regarding AC's achievement and performance because her scores were rounded up to "50."  For example, on March 7, 2019, AC's actual scores were 30 rather than the reported score of 50; and 25 rather than the reported score 50.

9)      On 3/20/19, AC's actual score was 30 rather than a reported 50 on her reading assignments.

2

10)    On or about March 28, 2019, the defendant indicated that AC had Other Health

Impairment ("OHI") and that she needed specially designed instruction. However, after

completing the paperwork, the defendant decided that based on AC's general academic profile,

AC did not meet the threshold for needing exceptional education support.

11)    In making this decision, HCPS failed to appropriately assess AC's eligibility under the

Individuals with Disabilities in Education Act ("IDEA") for an Individualized Education Plan

("IEP"). The defendant recommended that AC be given a Section 504 Plan under the

Rehabilitation Act of 1973 ("504 Plan") for deficits in attention, hyperactivity, and impulsivity,

which decision denied her FAPE.

12)    On or about April 26, 2019, AC's parents contacted the defendant and told his staff that

AC was getting failing grades and she needed an IEP for individualized instruction.

13)    On or about May 9, 2019, an Eligibility Meeting was held during which AC's Parents

explained that she also was failing reading and math, and needed individually designed

instruction.

14)    The 504-team determined that AC needed special education because of her ADHD. The

team decided to develop an IEP at the end of the school year. This also denied AC FAPE

because this decision prevented meaningful parent participation in educational decisions and also

denied AC educational benefits.

15)    ACs parents notified the team that AC was extremely stressed because of the inadequacy

of the 504 Plan.

16)    On or about June 3, 2019, ACs updated scores revealed the following: her reading score

was 28, which was far below the average score of 59.9; and the grade level pass rate of 37.5%.

Her math score was 52.5, which was again far below the average score 76.1 and the grade level pass rate of 71%.

17)     On or around June 5, 2019, an IEP meeting was scheduled for June 25, 2019.  AC's Parents advised they could not attend the meeting because they would be out of the country on a mission trip and requested that the meeting be rescheduled. This occurred on three separate occasions.

18)     The defendant refused to reschedule the meeting and advised AC's parents that a 59.9; IEP would be developed on that date and that parental consent would be obtained at a later date. The refusal to accommodate the parents was a capricious and arbitrary action which was a procedural violation of IDEA.

19)     An IEP was developed on June 25, 2019 without the parents be present.  The IEP provided a goal for reading comprehension and a goal for math word problems. These proposed goals and objectives were woefully lacking and defective because the IEP did not identify special education or related services.

20)     Also, the IEP did not provide for a Least Restrictive Environment and the predetermined goals also violated IDEA procedural requirements.

21)     On or about July 30, 2019, AC's parents contacted the Riverside School which is a private school for dyslexic children to schedule an Early Literacy Screening for AC

22)     The Riverside School screening showed that AC had all the markers for dyslexia.

23)     Riverside recommended that AC meet with a tutor qualified in using the Orton-Gillingham reading program for at least two times a week and that AC receive reading remediation at school.

24) On August 21, 2019, AC's parents shared the Riverside Screening Report with the defendant.

25) On or around August 29, 2019, ACs parents and the defendant met to review the IEP unilaterally developed by the defendant.

26) During the IEP meeting, the parents discussed the Riverside School Screening Report data with the IEP team. However, HCPS refused to consider the information from the Screening Report and did not recommend further evaluations. Also, the team refused to forward the information to the defendant's Dyslexia Advisor and decided that AC did not have a Specific Learning Disability ("SLD"), which denied her FAPE and also violated IDEA procedural requirements.

27) On or around August 29, 2019, AC's parents requested that decoding, spelling and written language he provided to AC as part of her measurable goals.

28) The IEP team refused this request and also as refused to provide AC with the Orton Gillingham approach. These refusals violated IDEA's procedural requirements and also denied AC with FAPE.

29) Because AC 's reading comprehension goal and math word problem's goal did not include baseline data, neither the IEP team members nor the parents were able to monitor ACs progress.

30) When AC's Parents requested that additional data be included this request was denied violating FAPE and IDEA's procedural requirements.

31) AC's goals developed by the IEP team did not provide meaningful educational benefit which also denied her FAPE.

32)     AC 's reading fluency goal was 72 words correct per minute (wcpm). Her parents however, requested the fluency goal being increased to 120 wcpm, which was the defendant's median rate for third grade.

33)     This request was refused without any explanation or justification. This resulted in this goal not being reasonably calculated to provide meaningful educational benefit which was a denial of FAPE.

34)     During the August 29, 2019 IEP meeting, AC's parents requested the team to provide a peer reviewed program to fit AC 's reading needs and to provide parents with the name of the program after school started.

35)     The IEP team refused to ensure that AC's parent receive information mandated by the IDEA regarding the determination of SLD-based eligibility and failed to consider or discuss information the parent provided from Riverside School, thus denying AC FAPE.

36)     At the August 29, 2019 IEP meeting, the Team did not acknowledge, discuss or explain AC 's needs related to her dyslexia.

37)     The Team refused to consider AC's processing deficits and pattern of underachievement that established her SLD or provide material information regarding how benchmark tests were conducted to evaluate a student's achievement in accordance with 34 CFR 300.311 mandates.

38)     Throughout its IEP process during the 2019-2020 school year, the defendant staff exhibited resentment and retaliation toward AC's parents as they provided information and requests for IEP goals and appropriate services.

39)     Also, the display of adversarial conduct by the defendant's staff and its agents, at the August 29, 2019 IEP team meeting, prevented meaningful parent participation and denied AC FAPE.

40)     The August 29, 2019 IEP was not reasonably calculated to provide meaningful benefit and denied her of a FAPE, in part, because the services were too meager to address AC 's dyslexia and academic deficient achievements in reading, spelling, written language and mathematics skills.

41)     The team recommended that AC be placed at its Pinchbeck Elementary School, with 150 minutes per week of reading in a special education setting.  At this meeting, her Parents informed the defendant they would fund an Orton Gillingham tutor for AC, however the defendant did not indicate to the parent that it would provide payment or reimbursement for these services.

42)     Parents decided to fund private tutoring services using Judy Moore, Orton Gillingham instructor starting September 2019 for two times per week at 50 minutes per session.  AC remained with Judy Moore from September 2019 through June 2020 and from September 2020 until March 2021.  Judy Moore provided reports to the defendant regarding AC 's progress.

43)     Despite documented concerns about the insufficiency of the August 29, 2019 IEP, parents consented to implementation of the IEP team's offer of 150 minutes of reading services per week as well as the team's goals which were inadequate.

44)     However, the Prior Written Notice and Parent Consent form did not include an option for partial parental consent to implement the IEP.

45)     On or about September 4, 2019, parents responded to an information form provided by the Exceptional Education Team which expressed concerns that none of defendant's employees understood how to teach AC who struggled with Dyslexia or whether AC had dyslexia.

46)     Because AC's progress and scores were far below her peers, her parents requested ongoing communication with teachers.

47)     On September 16, 2019, parents requested the defendant to provide an Independent Educational Evaluation (IEE) because it was defendant's position that there was no evidence AC had dyslexia.

48)     On September 17, 2019, the defendant approved the IEE for a psychological and educational evaluation.

49)     On or about September 23, 2019, a meeting was held with parents and the IEP team. Prior data, including the Riverside School Early Literacy Report, which was previously ignored resulted in the reopening of AC's eligibility and the IEP team agreed to reevaluate AC with selected components of psychological, vision and speech language specifically looking at her auditory processing, as well as providing her Assistive Technology (AT).

50)     Also, Westhampton Family Psychologists was to complete a psychoeducational evaluation.

51)     On or about September 23, 2019, parents asked for the name of the research-based reading instruction program being used for AC. Her parents also requested a peer-reviewed program to be used for AC 's reading instruction. This request was denied in lieu of reading instruction that was not peer-reviewed or effective for a child with dyslexia.

52)     This decision violated IDEA and Virginia's Guidelines for Educating Students with Specific Learning Disabilities, denied AC of FAPE, denied parent participation in educational decisions for her and denied AC educational benefit.

53)     On or about October 1, 2019, Westhampton Family Psychologists (WFP) concluded AC had Dyslexia and ADHD.

54)     On October 15, 2019, an Audiologist performed an evaluation and determined AC had Auditory Processing Disorder.

55)     On or about October 18, 2019, the parent observed AC at Pinchbeck Elementary. Her Special Education teacher used the Guided Reading technique and had AC read a story. When she came to the word (pretzel) which was a word she did not know, her teacher said to her, "Remember the story, you know it's something the animals are eating".  After three or four attempts of AC trying to say the word and guess words that started with 'p', the teacher told her that the word was "pretzel".

56)     This constituted "guided reading" which is not recommended by the International Dyslexia Association for a Dyslexic child.

57)     The Leveled Literacy Intervention (LLI) program by Fountas and Pinnell (F&P), which is used by the defendant which states, "Dyslexia is an umbrella term that covers a variety of learning disabilities. LLI was not specifically designed to meet the needs of students who have been tested and determined to have learning disabilities and been given an I.E.P."

58)     During this same observation, ACs parent observed she could only write the letters of the alphabet through the letter "N".

59)     On or about November 4, 2019, AC's second quarter progress report reveals that AC was below reading level.

60)     On or about November 26, 2019, HCPS convened an eligibility meeting to review data from HCPS and Westhampton Family Psychologists evaluations and he was determined that AC:

    a)     Had Auditory Processing Disorder (APD) with "Weaknesses in dichotic binaural decoding skills, binaural speech discrimination skills, auditory figure ground skills for the left ear, and processing rapid speech".

b)      Was in the 21 percentile for phonemic awareness and isolated reading fluency; 16 percentile for irregular word reading fluency and semantic concepts; 7 percentile for orthographical processing; and 5 percentile for morphological processing.

c)      Also, on Key Math-3, AC was in the 2 percentile for math problems; on the Northwest Evaluation Association Mastery and Progress (MAP) test scores, AC was in the 26th percentile for Math and 14th percentile for reading; on the Gallistel-Ellis Test of Decoding Skills for Reading, AC was on a kindergarten level for phonological awareness; and, on the Written Productivity Portfolio, AC wrote the alphabet at 3.2 words per minute which was substantially below the average handwriting speed for 3rd graders which is 7 words per minute).

d)      The Westhampton Family Psychologist report dated October 1, 2019, concluded AC had Dyslexia and ADHD.

e)      AC was in the lowest percentiles for Phonological Awareness (14), reading skills (16) and spelling (9). Her alphabet fluency was well below average and her accuracy when reading stories aloud was low average.

f)      AC 's phonological awareness, the ability to hear and manipulate the smallest segments of speech, was in the low average range.  Her ability to segment and isolate speech sounds was well below average while her ability to blend speech sounds was low average.

g)      AC 's visual skills were well above average. Her associative memory, associative learning and retention over time was low average.

h)      AC 's early reading skills, spelling skills, reading comprehension and math scores were low average.  She displayed low average calculation skills. Her skills related to

attention and focus were variable.  They rated borderline to significant concerns with her executive functioning skills.

i)     Dr. Shanan Raines provided many recommendations including: "Individualized daily instruction with an Orton-Gillingham tutor and AC may benefit from twenty hours of summer tutoring with an Orton-Gillingham (or equivalent) tutor.)".

j)     At the November 26, 2019 meeting, AC was found to be a child with a Specific Learning Disability (Dyslexia). At the that meeting, ACs parents consented for an HCPS Assistive Technology Referral.

61)     On December 12, 2019, HCPS administered the Protocol for Accommodations in Reading ("PAR").

62)     On or about December 19, 2019, the IEP team held a meeting and the following occurred:

a)     The Team failed to explain or discuss its abandonment or correlation of AC's prior IEP signed September 3, 2019.

b)     Under Area of Need, the IEP team failed to provide an accurate overview of AC's Auditory Processing Disorder or the results of her testing.

c)     Parents provided the team with a list of 10 needs related to phonemic awareness, morphological awareness, decoding, fluency, spelling, writing, comprehension (alphabet, fluency, mechanics, early reading skills, applied problem solving and orthographical processing) and eleven draft goals for AC 's new IEP.

d)     The IEP team refused Parent's requests for goals, except for one in morphology and instead imposed a unilateral decision to not include any other goals, in violation of IDEA procedural requirements.

e)      The results of this meeting were essentially the same as the previous IEP because the Team failed to identify special education or related services for AC 's Dyslexia or Executive Functioning needs.

f)      By failing to include in the new IEP additional goals and services to address the effects of AC 's disabilities, AC was denied meaningful educational benefit from the IEP and was also head FAPE.

g)      AC 's math goal (Goal 1), morphology goal (Goal 4) and spelling goal (Goal 5) did not include baseline data without which there could be no monitoring of AC 's progress.

h)      AC's parents asked the IEP team to include additional data which was denied thus violating IDEA's procedural requirements. As a result, goals were not reasonably calculated to provide meaningful educational benefit and denied AC FAPE.

i)      The IEP team continued its offer 150 minutes per week of math services in a general group setting; 150 minutes of executive functioning in a general group setting; and 150 minutes of reading services in a special education setting which was exactly the same that was given in the previous IEP (nothing changed from the previous IEP.

j)      When the parent asked why the services were not increased given that Dyslexia was added to the IEP, the team stated, "Services were already being provided to meet AC's reading needs prior to the additional category of SLD being added." This explanation violated IDEA procedural requirements denied AC FAPE.

k)      The IEP team also failed to:

    i)      Include goals in all areas of need.

    ii)     To develop goals which were appropriate, objectively measurable.

       iii)     That did not obstruct meaningful parent participation

       iv)     Did not preclude formation of an IEP which was IDEA compliant.

       v)     That identified an interest AC 's needs for appropriate services

       vi)     Provide AC with FAPE.

63)    On December 19, 2019, the results from the PAR indicated AC preferred the computer to read the text to her.

64)    Because Assistive Technology (AT) was not provided to AC until September 2020, she was not able to access her instructional materials provided by HCPS and AC was denied an important tool to help her access his curriculum like other non-disabled peers, which was a clear denial of FAPE and the ADA.

65)     On or about February 18, 2020, AC's parents consented to implementation of the December 19, 2019 IEP despite their documented reservations about the IEP.

66)    On or about March 16, 2020, defendant closed school in accordance with State mandate to address the COVID 19 pandemic and IEP services were not delivered throughout the remainder of the school year.

67)    Because IEP services were insufficient given AC's unique disability-related needs from March through June, AC's parents continued to fund private tutoring services through March 2021 as well as instruction by the Dyslexia Institute on morphology from April 6 through April 29, 2019.

68)    AC 's June 12, 2020, Final Progress Report established that she was reading below grade level.

69)     On or about June 30, 2020, AC's Parent requested Extended School Year ("ESY")
because she had not received reading services since March 2020 and she badly needed reading
instruction.

70)     Defendant did not agree to ESY claiming that AC was making progress, which was
completely countered by the results of her Final Progress Report. This refusal violated IDEA
procedural requirements and denied AC FAPE.

71)     On or about July 22, 2020, AC was evaluated by the Children's Hospital at Virginia
Commonwealth University and the following were administered: Behavior Rating Inventory of
Executive Functioning, 2nd Edition ("BRIEF2"); Phonological Awareness Screening Test
("PAST"); Words Their Way Elementary Spelling Inventory; and Test of Word Reading
Efficiency-Second Edition ("TOWRE-2").

72)     The results of these tests were as follows:

        a)      PAST, her performance was identical to the test she took on September 9, 2019

        b)       Words: her performance indicated that AC 's spelling was typical of a second-
        grade student.

        c)      In TOWRE-2, AC scored a 90 on the Sight Word Efficiency, which was in the 25
        percentile.

73)     Because of these unacceptable results, AC's parents funded a summer camp at Riverside
School, which specialized in language disabilities.

74)     On or about August 28, 2020, AC's parents contacted the defendant inquiring who would
provide AC's reading instruction as her previous teacher was no longer employed and were
informed by the defendant that Michelle Nester has been assigned as AC 's Special Education

Teacher and she did not specialize in Orton-Gillingham training, which was the "gold standard" for teaching and training dyslexic students.

75) When the parents contacted Ms. Nester, she stated that she was not a reading specialist. She went on to state that she had a master's degree in teaching and was certified to work with children in exceptional education as well as elementary-aged children.

76) On or about September 12, 2020, AC's parents shared with HCPS their intent to file a Due Process Complaint and to request private placement.

77) On or about September 21, 2020, Rebecca Hodell, defendant's Dyslexia Advisor assessed AC 's reading achievement. It was later learned that Ms. Hodell wrongly scored the assessment resulting in AC being assigned to fourth-grade instructional level.

78) On or about September 27, 2020, ACs parent requested copies of all AC's educational records to prepare for an October 6, 2020 IEP meeting.

79) After reviewing the file, parent indicated to defendant that not all of ACs records were provided, including, PALS, Fountas & Pinnell, Math Screeners, NWEA MAP Growth scores, COGAT, Semester Benchmarks, Non-Writing SOLs and HATS data.

80) This denial constituted a procedural violation under IDEA and a denial of FAPE.

81) On or about October 3, 2020, AC displayed evidence of self-injurious behaviors ("SIB") due to anxiety brought on by HCPS.

82) On October 6, 2020, AC was diagnosed with anxiety by her pediatrician, and they recommended counseling. AC began counseling with Dr. Steven Butnik, a psychologist.

83) On or about October 6, 2020, an IEP meeting was held to discuss AC's regression in phonological awareness and spelling as revealed by Children's Hospital reports.

84)     This resulted in defendant recommending two new goals for reading and reading services to be provided by Terri Crenshaw, a special education teacher.

85)     On or about October 15, 2020, Virginia Ramos, who at that time held a Provisional License became AC's new Case Manager and Special Education teacher.

86)     Direct Reading Services as outlined in the IEP (signed February 18, 2020) were not provided from September 8, 2020, until November 1, 2020.

87)     On or about November 2, 2020, parent met with AC's teacher and Special Education Teacher to discuss AC's struggles with completing work.  During that meeting, AC's Parent requested that AC be provided written tests rather than computerized tests and provided their email address to send tests and quizzes.

88)     Parent advised that AC did best with multi-sensory instruction, and they also discussed concerns about AC's writing.  Parent also asked when 15 minutes of reading services would begin. Defendant's response was that this information was not known.

89)     On or about November 6, 2020, Virginia Ramos emailed Special Education Coordinator Ginger Sanderson that she was not aware that she was to provide 15 minutes of reading services daily for AC.

90)     On or about December 1, 2020, the Phonological Awareness Screening Test (PAST) was administered to AC by Children's Hospital, which revealed that AC was on an early to late second grade level for phonemic awareness.

91)     On or about December 10, 2020, parents provided a two-page Parent Concerns letter for the IEP advising that AC had difficulties in reading due to her weakness in phonological awareness and her ability to hear and manipulate the smallest segments of speech.

92)     Parents also indicated that AC struggled with spelling, writing, math, sequencing, organization, executive function, self-esteem and that AC was "extremely concerned about making Ds and Fs and not doing well in school.  They also advised that AC had told them on several occasions that she was going to get kicked out of school because she was "making bad grades".

93)     On or about December 10, 2020, Parents consulted with Robin Hegner of Pathways to Reading to review the assessment data provided by Rebecca Hodell defendant's Dyslexia Advisor in September 2020.

94)     According to Ms. Hegner, the data provided by defendant was incorrect and AC was on an instructional third-grade versus a fourth-grade instructional level. AC continued to be instructed on the wrong reading level which led to her having more stress and anxiety.

95)     On or about December 15, 2020, while AC' parents were present, defendant gave AC a PAST test. When her Parent documented words that are not automatic during the testing, defendant changed the results, and indicated AC was not automatic at levels K, L, and M and that AC was on second grade level for phonemic awareness, although she was currently in the fourth grade.

96)     On or about December 17, 2020, parents and their advocates met with a defendant representative to develop the annual IEP.  Parents indicate AC was stressed due to school instruction and failing grades and provided a list of AC 's needs.

97)     Defendant indicated that AC had difficulty with multi syllabic words since 2019, yet nothing was included in the IEP to provide a structured literacy program for AC.

98)     The IEP team incorrectly concluded that AC had mastered word problems the previous year.  Parent disagreed explaining that AC had over thirty-word problems, based on the current school year's test and quizzes, and the fact that she could not answer them.

99)     Parents indicated they were concerned with AC 's reading fluency which test showed she was in the 70s, words correct per minute, which was in the 10th percentile for fluency for 4th grade.

100)    Throughout the IEP Meeting, the Team requested that parent's advocate provide guidance on evaluations and how to score them, including the QRI and PAST because no one on the team was able to answer questions related to dyslexia and structured literacy or testing.

101)    Although the October 30, 2020, IEP dated indicated that HCPS would provide services based on peer-reviewed research, it did not include the program that would be used for reading, thus this IEP was both inadequate, incompetent, and denied FAPE.

102)    HCPS also inflated AC's failing grades on tests and quizzes, so that it appeared that she received passing grades which denied FAPE.

103)    The team continued to engage in intentional misrepresentations of AC's performances. For example, on or about December 17, 2020, the IEP team provided intentional misrepresentation of goal data from AC's past IEPs, including but not limited to including under Goals #1 and 2 that AC mastered both goals in January 2020.

104)     On or about December 15, 2020, emails verify how the IEP team misrepresented IEP goal data by representing that AC was making progress.  This was another example of the defendant's retaliation, so AC's parents would not request additional services or private placement.

105)    On or about January 4, 2020, parent contacted Michael Capehart, defendant's psychologist and requested Weschsler Intelligence Scale for Children (WISC-V) subtest data from AC' s March 2019 assessment. The subtest data indicates significant variation in scores which were never shared with AC's parents.

106)    On or about January 4, 2021, parent contacted Sarah Slaughter a defendant principal regarding use of participation grades, qualifications of Special Education teacher Virginia Ramos and AC's Progress report.

107)    On or about January 5, 2021, Ms. Slaughter told AC's parent that participation grades may have inflated grades during first quarter, HCPS adopted a new reading level guidance for the 2020-2021 school year and that Ms. Ramos was on a provisional status with no Orton Gillingham training.

108)    On or about January 14, 2021, parents, parent's advocates, and Dr. Kavita Kaul, AC's Speech and Language Pathologist and defendant met for a second IEP meeting.  Changes which were agreed to at the December 17, 2020, were not included. Also, the team reviewed Present Levels of Academic Achievement and Functional Performance sections and a third IEP meeting was scheduled for January.

109)    On or about January 19, 2021, parent sent a letter and email to HCPS Superintendent requesting copies of AC 's permanent, cumulative and confidential educational records pursuant to the Family Educational Records and Privacy Act 20 U.S.C. § 1232g; 34 CFR Part 99 ("FERPA") and the request was treated as a request under The Freedom of Information Act ("FOIA").

110)    On or about February 22, 2021, HCPS provided emails related to the FOIA request, but educational records were not provided.

111)     On or about January 20, 2021, parents submitted an amended parent concerns letter to the IEP team in which they stated: "Our primary concerns are that AC did not meet any of her seven goals included in the 2019-2020 IEP and AC's grades were inflated by at least one letter grade with the addition of "participation grades".

112)     On or about January 22, 2021, parents and their advocates met for a third IEP meeting. Based upon AC's educational needs in reading, writing, math and executive functioning, parent requested that AC be placed in a private day school for students with language disabilities and the defendant recommended that AC be placed in public school and could consider mediation or resolution if they did not agree with the Team's placement recommendation.

113)     On or about January 29, 2021, parents request AC be provided a recorded TEAMS meeting of music class, so AC could learn to play the Recorder (instrument).

114)     Parents were provided a blog link instead and AC was not allowed to participate in or provided access to any resource class in art, music, or PE due to HCPS' specialized reading instruction from November 2020 to June 2021.

115)     This was contrary to the consented to IEP, which provided that AC would have access to general education classes, special education classes, other school services and activities including nonacademic activities.  Therefore, the denial set forth violated AC's rights under Title II of the Americans with Disabilities Act.

116)     On or about February 22, 2021, another request was made to defendant for AC's educational records.

117)     On or about February 26, 2021, after parents met with defendant on three separate occasions, for over five hours to develop an IEP, parents refused to consent to the proposed IEP because it provided incorrect information in the Present Level of Academic Achievement; it did

not provide AC with educational benefit, and it did not provide peer-reviewed instruction or appropriate placement, all of which denied FAPE.

118)     On or about March 16, 2021, HCPS stated that it did not have any records that informed previous years IEPs.

119)     Parents filed for a due process hearing on March 26, 2021, for denial of FAPE for 2018-2019, 2019-2020, and 2020-2021 school years and requested reimbursement for special education services parent provided, compensatory services, COVID compensatory services and private placement.

120)     June 14, 2021 was the first day of the hearing, which was conducted over several dates and both sides presented exhaustive and credible evidence, but the most credible in his determination was from the student's mother and her primary witness, Ms. Debra Tisler. The Hearing Officer issued a decision on September 23, 2021.

121)     AC's parents decided to withdraw AC from defendant and unilaterally enrolled her in The New Community School (New Community) because of the many failures and refusals of the defendant to provide their daughter with FAPE and the meaningful education based upon competent and adequate IEPs.

122)     ACs parents began paying from their own resources the tuition required by New Community and are currently paying for her tuition.

123)     AC began thriving at New Community and many of her negative behaviors that she exhibited while attending public school have dissipated or even disappeared, which indicates to her parents that she is doing well and is corroborated by the teachers and administrators at New Community..

124)     The Hearing Officer ultimately ruled that the student and her parents were the prevailing

parties and that he was convinced that HCPS did not comply with the requirements of IDEA and failed to provide AC with FAPE.

125)    However, the Hearing Officer denied and dismissed requests by the parent and student for reimbursement for compensatory services, special education and related services and tuition.

126)    The Hearing Officer's decision in denying and dismissing requests by the parent and student was not regularly made and was contrary to the law and the evidence for compensatory services, special education and related services and tuition.

127)    On December 17, 2021, HCPS declared in AC's IEP that HCPS  could not provide an appropriate education and recommended placement of AC to Northstar Academy (Northstar).

128)    Plaintiffs requested that defendant place AC at New Community citing her positive adjustment, increased confidence, and improved skills as the primary reason for this request.

129)    Defendant however rejected the request and opted for Northstar because the New Community was an independent private school, not licensed by the Virginia Department of Education as a private day school for students with disabilities, as opposed to Northstar.

130)    Plaintiffs pointed out that New Community was accredited by three different accreditation associations and as such, does not require state licensure; that it specialized in instruction to students with dyslexia, that it used Orton-Gillingham reading methodology; and it placed a high emphasis on college.

131)    Northstar on the other hand, emphasized vocational training rather than college-bound and since AC wanted to go onto college that this was the better placement for her.

132)    Also, during the discussion, it was clear that none of the HCPS members of the IEP team had visited Northstar or New Community and therefore had no knowledge about either school.

133)    Defendant also emphasized that AC's parents would need to apply for the Children's Services Act (CSA) funding, which would relieve the defendant of having to pay for private placement. This was the major consideration and reason that the defendant opted for Northstar.

134)    Also, Northstar admitted students with various disabilities, while The New Community School only admitted students with Specific Learning Disabilities (dyslexia, dysgraphia and dyscalculia).

135)    AC's parents declined to transfer AC to Northstar because it was not in her best interest academically, and with regard to her disability.

136)    On May 12, 2022, a School Board Meeting was held for Henrico County Public Schools. At this meeting, Katie Smith, Director of Special Education for Defendant, made several statements admitting that Defendant does not have any teachers certified to teach Orton-Gillingham and that Defendant was looking to get teachers certified, despite Defendant asserting at the hearing a little less than a year prior that Defendant's staff was in fact trained in Orton-Gillingham.

137)    AC is currently enrolled at The New Community School for the 2023-2024 school year, and it is anticipated that AC will continue to be enrolled there through 12th grade.

138)    On October 4, 2023, the Hearing Officer held a phone meeting with an educational advocate for Plaintiffs which was captured in an audio recording, in which the Hearing Officer admits to being coerced by the Evaluator for the Virginia Department of Education to not admit Plaintiff's primary witness, Ms. Debra Tisler, as an expert in the hearing. The Hearing Officer admits that had he been provided evidence of the New Community School as being appropriate, he would have ruled that the AC be placed there. The Hearing Officer further states that he was fired as a Hearing Officer after this hearing, and was told by the VDOE that he was no longer

qualified as a Hearing Officer due to scheduling another date for the hearing without a request

from the parties to do so, as well as for making the decision that he made in Plaintiff's favor. The

Hearing Officer did not fight this decision since he was near to retirement at the time. The

Hearing Officer further alludes to no longer having restrictions on what he can say about how he

would have handled the hearing, and that he could be a witness.

## IV. LEGAL CLAIMS

## COUNT I

**(Defendant Violated the federal laws of the IDEA and ADA based on the evidence
presented, which was not taken into consideration by the Hearing Officer and thus
allowed Defendant no consequence for denial of FAPE for AC, as well as discriminatory
action against AC as a student with disabilities)**

### A. THE HEARING OFFICER'S DECISION ON PRIVATE PLACEMENT WAS NOT REGULARY MADE AND FURTHER DUE TO COERCION

139)    Paragraphs 1-138 are restated and realleged as if fully stated herein.

140)    The hearing officer's decision was not regularly made and lacked consideration of the

overwhelming evidence demonstrating that Defendant could not provide a FAPE to AC.

141)    Because the hearing officer's decision was not regularly made, it is not entitled to "due

weight" by this Court.

142)    Despite numerous documented instances of AC's academic struggles, emotional distress,

and the persistent inadequacy of the educational program designed by HCPS, the hearing officer

failed to recognize the urgent need for a tailored and specialized education environment, like the

one provided to AC at The New Community School.

143)    The hearing officer's decision disregarded the intentional misrepresentation and inflation

of AC's grades by HCPS, which misled both the parents and the decision-making body about

AC's true academic standing and progress.

144)    The recommendation made by the hearing officer did not consider the documented evidence that the IEPs developed by HCPS were fundamentally flawed and lacked the necessary peer-reviewed instruction and appropriate placement for AC.

145)    AC's parents' and AC's expert witness' testimonies regarding placement at The New Community School, were not duly considered. These testimonies clearly indicate The New Community School was an appropriate placement.

146)    Given the exhaustive and credible evidence presented, especially from the student's mother and primary witness, Ms. Debra Tisler, the hearing officer's determination that private placement wouldn't benefit AC was inconsistent with the presented facts.

147)    Despite clear evidence showing the inadequacies of HCPS's IEPs and services, the hearing officer did not recognize the consistent efforts made by AC's parents to collaborate with HCPS to develop an effective IEP. Their ultimate decision to seek private placement was driven by the school system's persistent failures.

148)    The hearing officer overlooked the significant financial burden shouldered by AC's parents to ensure their child receives an appropriate education. This burden was a direct consequence of HCPS's failure to provide FAPE. This financial burden violates the IDEA's promise to provide an appropriate education to all students without charge.

149)    By not granting private placement, the hearing officer's decision deprives AC of her right to receive a FAPE in the least restrictive environment, contrary to the mandates of IDEA.

150)    Furthermore, after the due process hearing, Defendant stated in their IEP that the school could not provide a FAPE to AC and attempted to place AC in a different school.

151)    This Court can consider new evidence not presented during the due process hearing. Defendant's admission that it could not provide a FAPE to AC and its attempt to place AC in a

different school serve as strong evidence that the hearing officer's decision that she did not need private placement was not regularly made.

152)    Further, a significant portion of the administrative record is missing.  Defendant stated they obtained the record, but only one page of the Hearing Officer's notes were included.  One of Defendant's arguments was that the Hearing Officer wasn't engaged in the underlying hearing and only had one page of notes for the entire hearing. The Hearing Officer, however references 45 pages of notes in a letter to the Virginia Department of Education upon providing his ruling, but they were not scanned and included in the record. This error by the Hearing Officer further supports the Hearing Officer's decision not being regularly made.

153)    Additionally, in a phone call made to Plaintiff's advocate on October 4, 2023, the Hearing Officer admits that had he been provided evidence of the New Community School as being appropriate, he would have ruled that the AC be placed there. As already provided, Plaintiffs' provided ample evidence of the New Community School, and further introduced through their primary witness, Ms. Debra Tisler, the appropriateness of the New Community School for AC's educational needs and development. This coupled with the Hearing Officer's admission to being persuaded by the Evaluator for the VDOE to not accept Plaintiffs' primary witness as an expert further supports the argument that the Hearing Officer's decision was not regularly made.

154)    Because Defendant denied AC a FAPE under the IDEA, AC's parents are entitled to reimbursement of all special education services they provided and because AC's placement at The New Community School is appropriate, AC is (1) entitled to reimbursement of tuition costs incurred for attending The New Community School, and (2) compensatory education at The New Community School. Compensatory education is a future-focused remedy determined by a court

to address any educational gaps resulting from an educational agency's prolonged failure to
provide a student with a FAPE, as Defendant has done here.

### B. DEFENDANT VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131 et seq. WITH ITS ACTIONS.

155)    Paragraphs 1-154 are restated and realleged as if fully stated herein.

156)    Title II of the Americans with Disabilities Act (ADA) and its regulations provide that "no
qualified individual with a disability shall, by reason of such disability, be excluded from
participation in or be denied the benefits of the services, programs, or activities of a public entity,
or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. (See also 28 C.F.R.
Part 35).

157)    Defendant is a public entity subject to Title II of the ADA, 42 U.S.C. § 12132.

158)    AC is a person with a disability within the meaning of 42 U.S.C. § 12102.

159)    Defendant intentionally violated AC's rights under the ADA regulations by excluding her
from participation in and denying her the benefits of Defendants' services, programs, and
activities, on the basis of disability, and by subjecting her to discrimination in violation of 42
U.S.C. § 12132.

160)    Defendant otherwise intentionally discriminated against AC in violation of the 42 U.S.C.
§ 12132.

161)    As a direct and proximate cause of Defendants' violations of the ADA as well as the
IDEA, AC has suffered and continues to suffer severe and grievous mental and emotional
suffering, humiliation, stigma, and other injuries she will continue to suffer.

162)    The Defendant violated the integration mandate of Title II of the ADA by unnecessarily
segregating AC in school and not allowing her to attend music, art or physical education during

27

fourth grade when AC could have participated and should have been provided the same educational instruction as her non-disabled peers.

163) The Defendant violated the accessibility mandate of Title II of the ADA when it failed to provide the appropriate auxiliary aids and services, specifically assistive technologies so AC could read the same books and homework assignments as her peers, and access all instructional materials provided by the defendant on the computer.

164) The Defendant violated the ADA when it retaliated against AC and changed AC's progress reports to indicate AC was improving on all her goals.  This retaliation denied AC's parents the right to fully participate in a discussion of AC's needs.  The defendant had a duty to preserve educational records, provide accurate information and not mislead AC's parents as the progress reports were directly relevant to the parties' disputes.

## V.  PRAYER FOR RELIEF

**WHEREFORE**, for the above-stated reasons as listed in this Second Amended Complaint, Plaintiffs respectfully request that this Court:

a. Reverse the denial by the Hearing Officer for the private placement of AC because this ruling was not regularly made.

b. Issue an ORDER for equitable relief and declaratory judgment, stating that the Hearing Officer's analysis and decision contained mistakes of law that were flawed and clearly erroneous,

c. ORDER Defendant to provide compensatory educational services to compensate the child for its failure to provide a FAPE, and

d. ORDER Defendant to reimburse AC's parents for the services obtained and tuition and costs that they have incurred in sending AC to The New Community School and to

require the Defendant to pay the tuition and other costs of The New Community School as long as AC attends the school.

      e.      Find that Defendant violated federal law;

      f.      Find that Plaintiff is the prevailing party;

      g.      Award Plaintiff equitable and injunctive relief;

      h.      Award Plaintiff compensatory damages;

      i.      Grant reasonable attorneys' fees and costs, and ORDER such other, further relief, and permissible damages as the nature of this case justifies and requires.

**Respectfully submitted,**

**AC, by and through RC,**
**as parent and next friend**

_____/s/_____
W. Peyton Akers, Esq. (VSB# 89933)
peyton@aclawva.com
Akers & Cleator Law Group, P.L.L.C.
3917 Midlands Road
Building Two, Suite 100
Williamsburg, Virginia 23188
Phone: 757-707-8838
Fax: 757-707-8828

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October 2023 I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John D. McChesney, Esq.
**Counsel for County of Henrico School Board**

And to the following non-filing users:

NONE

_____/s/_____
W. Peyton Akers, Esq. (VSB# 89933)
peyton@aclawva.com
Akers & Cleator Law Group, P.L.L.C.
3917 Midlands Road
Building Two, Suite 100
Williamsburg, Virginia 23188
Phone: 757-707-8838
Fax: 757-707-8828
